## UNITED STATES ET AL. *v.* LOCKE ET AL.

No. 83–1394. Argued November 6, 1984—Decided April 1, 1985

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, REHNQUIST, and O'CONNOR, JJ., joined. O'CONNOR, J., filed a concurring opinion, *post*, p. 110. POWELL, J., filed a dissenting opinion, *post*, p. 112. STEVENS, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 117.

*Carolyn F. Corwin* argued the cause for appellants. With her on the briefs were *Solicitor General Lee, Assistant Attorney General Habicht, Deputy Solicitor General Claiborne, David C. Shilton,* and *Arthur E. Gowran.*

*Harold A. Swafford* argued the cause for appellees. With him on the brief was *John W. Hoffman.**

---

*Laurens H. Silver* and *John Leshy* filed a brief for the Sierra Club as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of Nevada by *Brian McKay,* Attorney General, and *James C. Smith,* Deputy Attorney General; for the Alaska Miners Association et al. by *Ronald A. Zumbrun* and *Robin L. Rivett;* for the Colorado Mining Association by

JUSTICE MARSHALL delivered the opinion of the Court.

The primary question presented by this appeal is whether the Constitution prevents Congress from providing that holders of unpatented mining claims who fail to comply with the annual filing requirements of the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U. S. C. § 1744, shall forfeit their claims.

I

From the enactment of the general mining laws in the 19th century until 1976, those who sought to make their living by locating and developing minerals on federal lands were virtually unconstrained by the fetters of federal control. The general mining laws, 30 U. S. C. § 22 *et seq.*, still in effect today, allow United States citizens to go onto unappropriated, unreserved public land to prospect for and develop certain minerals. "Discovery" of a mineral deposit, followed by the minimal procedures required to formally "locate" the deposit, gives an individual the right of exclusive possession of the land for mining purposes, 30 U. S. C. § 26; as long as $100 of assessment work is performed annually, the individual may continue to extract and sell minerals from the claim without paying any royalty to the United States, 30 U. S. C. § 28. For a nominal sum, and after certain statutory conditions are fulfilled, an individual may patent the claim, thereby purchasing from the Federal Government the land and minerals and obtaining ultimate title to them. Patenting, however, is not required, and an unpatented mining claim remains a fully recognized possessory interest. *Best* v. *Humboldt Placer Mining Co.*, 371 U. S. 334, 335 (1963).

By the 1960's, it had become clear that this 19th-century laissez-faire regime had created virtual chaos with respect to the public lands. In 1975, it was estimated that more than

*Randy L. Parcel;* for Mobil Oil Corp. by *Stephen D. Alfers* and *William A. Hillhouse II;* and for the Mountain States Legal Foundation by *K. Preston Oade, Jr.*

6 million unpatented mining claims existed on public lands other than the national forests; in addition, more than half the land in the National Forest System was thought to be covered by such claims. S. Rep. No. 94–583, p. 65 (1975). Many of these claims had been dormant for decades, and many were invalid for other reasons, but in the absence of a federal recording system, no simple way existed for determining which public lands were subject to mining locations, and whether those locations were valid or invalid. *Ibid.* As a result, federal land managers had to proceed slowly and cautiously in taking any action affecting federal land lest the federal property rights of claimants be unlawfully disturbed. Each time the Bureau of Land Management (BLM) proposed a sale or other conveyance of federal land, a title search in the county recorder's office was necessary; if an outstanding mining claim was found, no matter how stale or apparently abandoned, formal administrative adjudication was required to determine the validity of the claim.[1]

After more than a decade of studying this problem in the context of a broader inquiry into the proper management of the public lands in the modern era, Congress in 1976 enacted FLPMA, Pub. L. 94–579, 90 Stat. 2743 (codified at 43 U. S. C. § 1701 *et seq.*). Section 314 of the Act establishes a federal recording system that is designed both to rid federal lands of stale mining claims and to provide federal land managers with up-to-date information that allows them to make informed land management decisions.[2] For claims located before FLPMA's enact-

---

[1] See generally Strauss, Mining Claims on Public Lands: A Study of Interior Department Procedures, 1974 Utah L. Rev. 185, 193, 215–219.

[2] The text of 43 U. S. C. § 1744 provides, in relevant part, as follows:

"Recordation of Mining Claims

"(a) Filing requirements

"The owner of an unpatented lode or placer mining claim located prior to October 21, 1976, shall, within the three-year period following October 21,

ment,[3] the federal recording system imposes two general requirements. First, the claims must initially be registered with the BLM by filing, within three years of FLPMA's enactment, a copy of the official record of the notice or cer-

---

1976 and prior to December 31 of each year thereafter, file the instruments required by paragraphs (1) and (2) of this subsection. . . .

"(1) File for record in the office where the location notice or certificate is recorded either a notice of intention to hold the mining claim (including but not limited to such notices as are provided by law to be filed when there has been a suspension or deferment of annual assessment work), an affidavit of assessment work performed thereon, on a detailed report provided by section 28-1 of title 30, relating thereto.

"(2) File in the office of the Bureau designated by the Secretary a copy of the official record of the instrument filed or recorded pursuant to paragraph (1) of this subsection, including a description of the location of the mining claim sufficient to locate the claimed lands on the ground.

"(b) Additional filing requirements

"The owner of an unpatented lode or placer mining claim or mill or tunnel site located prior to October 21, 1976 shall, within the three-year period following October 21, 1976, file in the office of the Bureau designated by the Secretary a copy of the official record of the notice of location or certificate of location, including a description of the location of the mining claim or mill or tunnel site sufficient to locate the claimed lands on the ground. The owner of an unpatented lode or placer mining claim or mill or tunnel site located after October 21, 1976 shall, within ninety days after the date of location of such claim, file in the office of the Bureau designated by the Secretary a copy of the official record of the notice of location or certificate of location, including a description of the location of the mining claim or mill or tunnel site sufficient to locate the claimed lands on the ground.

"(c) Failure to file as constituting abandonment; defective or untimely filing

"The failure to file such instruments as required by subsections (a) and (b) of this subsection shall be deemed conclusively to constitute an abandonment of the mining claim or mill or tunnel site by the owner; but it shall not be considered a failure to file if the instrument is defective or not timely filed for record under other Federal laws permitting filing or recording thereof, or if the instrument is filed for record by or on behalf of some but not all of the owners of the mining claim or mill or tunnel site."

[3] A somewhat different scheme applies to claims located after October 21, 1976, the date the Act took effect.

tificate of location. 90 Stat. 2743, § 314(b), 43 U. S. C. § 1744(b). Second, in the year of the initial recording, and "prior to December 31" of every year after that, the claimant must file with state officials and with BLM a notice of intention to hold the claim, an affidavit of assessment work performed on the claim, or a detailed reporting form. 90 Stat. 2743, § 314(a), 43 U. S. C. § 1744(a). Section 314(c) of the Act provides that failure to comply with either of these requirements "shall be deemed conclusively to constitute an abandonment of the mining claim . . . by the owner." 43 U. S. C. § 1744(c).

The second of these requirements—the annual filing obligation—has created the dispute underlying this appeal. Appellees, four individuals engaged "in the business of operating mining properties in Nevada,"[4] purchased in 1960 and 1966 10 unpatented mining claims on public lands near Ely, Nevada. These claims were major sources of gravel and building material: the claims are valued at several million dollars,[5] and, in the 1979–1980 assessment year alone, appellees' gross income totaled more than $1 million.[6] Throughout the period during which they owned the claims, appellees complied with annual state-law filing and assessment work requirements. In addition, appellees satisfied FLPMA's initial recording requirement by properly filing with BLM a notice of location, thereby putting their claims on record for purposes of FLPMA.

At the end of 1980, however, appellees failed to meet on time their first annual obligation to file with the Federal Government. After allegedly receiving misleading information from a BLM employee,[7] appellees waited until December 31

---

[4] Complaint ¶ 2.

[5] *Id.,* ¶ 15.

[6] 573 F. Supp. 472, 474 (1983). From 1960 to 1980, total gross income from the claims exceeded $4 million. *Ibid.*

[7] An affidavit submitted to the District Court by one of appellees' employees stated that BLM officials in Ely had told the employee that the

to submit to BLM the annual notice of intent to hold or proof of assessment work performed required under § 314(a) of FLPMA, 43 U. S. C. § 1744(a). As noted above, that section requires these documents to be filed annually "prior to December 31." Had appellees checked, they further would have discovered that BLM regulations made quite clear that claimants were required to make the annual filings in the proper BLM office "on or before December 30 of each calendar year." 43 CFR § 3833.2–1(a) (1980) (current version at 43 CFR § 3833.2–1(b)(1) (1984)). Thus, appellees' filing was one day too late.

This fact was brought painfully home to appellees when they received a letter from the BLM Nevada State Office informing them that their claims had been declared abandoned and void due to their tardy filing. In many cases, loss of a claim in this way would have minimal practical effect; the

---

filing could be made at the BLM Reno office "on or before December 31, 1980." Affidavit of Laura C. Locke ¶ 3. The 1978 version of a BLM question and answer pamphlet erroneously stated that the annual filings had to be made "on or before December 31" of each year. Staking a Mining Claim on Federal Lands 9–10 (1978). Later versions have corrected this error to bring the pamphlet into accord with the BLM regulations that require the filings to be made "on or before December 30."

JUSTICE STEVENS and JUSTICE POWELL seek to make much of this pamphlet and of the uncontroverted evidence that appellees were told a December 31 filing would comply with the statute. See post, at 117, 122, 128. However, at the time appellees filed in 1980, BLM regulations and the then-current pamphlets made clear that the filing was required "on or before December 30." Thus, the dissenters' reliance on this pamphlet would seem better directed to the claim that the United States was equitably estopped from forfeiting appellees' claims, given the advice of the BLM agent and the objective basis the 1978 pamphlet provides for crediting the claim that such advice was given. The District Court did not consider this estoppel claim. Without expressing any view as to whether, as a matter of law, appellees could prevail on such a theory, see Heckler v. Community Health Services of Crawford County, Inc., 467 U. S. 51 (1984), we leave any further treatment of this issue, including fuller development of the record, to the District Court on remand.

claimant could simply locate the same claim again and then rerecord it with BLM. In this case, however, relocation of appellees' claims, which were initially located by appellees' predecessors in 1952 and 1954, was prohibited by the Common Varieties Act of 1955, 30 U. S. C. § 611; that Act prospectively barred location of the sort of minerals yielded by appellees' claims. Appellees' mineral deposits thus escheated to the Government.

After losing an administrative appeal, appellees filed the present action in the United States District Court for the District of Nevada. Their complaint alleged, *inter alia,* that § 314(c) effected an unconstitutional taking of their property without just compensation and denied them due process. On summary judgment, the District Court held that § 314(c) did indeed deprive appellees of the process to which they were constitutionally due. 573 F. Supp. 472 (1983). The District Court reasoned that § 314(c) created an impermissible irrebuttable presumption that claimants who failed to make a timely filing intended to abandon their claims. Rather than relying on this presumption, the Government was obliged, in the District Court's view, to provide individualized notice to claimants that their claims were in danger of being lost, followed by a post-filing-deadline hearing at which the claimants could demonstrate that they had not, in fact, abandoned a claim. Alternatively, the District Court held that the 1-day late filing "substantially complied" with the Act and regulations.

Because a District Court had held an Act of Congress unconstitutional in a civil suit to which the United States was a party, we noted probable jurisdiction under 28 U. S. C. § 1252. 467 U. S. 1225 (1984).[8] We now reverse.

---

[8] That the District Court decided the case on both constitutional and statutory grounds does not affect this Court's obligation under 28 U. S. C. § 1252 to take jurisdiction over the case; as long as the unconstitutionality of an Act of Congress is one of the grounds of decision below in a civil suit

## II

Appeal under 28 U. S. C. § 1252 brings before this Court not merely the constitutional question decided below, but the entire case. *McLucas* v. *DeChamplain*, 421 U. S. 21, 31 (1975); *United States* v. *Raines*, 362 U. S. 17, 27, n. 7 (1960). The entire case includes nonconstitutional questions actually decided by the lower court as well as nonconstitutional grounds presented to, but not passed on, by the lower court. *United States* v. *Clark*, 445 U. S. 23, 27–28 (1980).[9] These principles are important aids in the prudential exercise of our appellate jurisdiction, for when a case arrives here by appeal under 28 U. S. C. § 1252, this Court will not pass on the constitutionality of an Act of Congress if a construction of the Act is fairly possible, or some other nonconstitutional ground fairly available, by which the constitutional question can be avoided. See *Heckler* v. *Mathews*, 465 U. S. 728, 741–744 (1984); *Johnson* v. *Robison*, 415 U. S. 361, 366–367 (1974); cf. *United States* v. *Congress of Industrial Organizations*, 335 U. S. 106, 110 (1948) (appeals under former Criminal Appeals Act); see generally *Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (Brandeis, J., concurring). Thus, we turn first to the nonconstitutional questions pressed below.

---

to which the United States is a party, appeal lies directly to this Court. *United States* v. *Rock Royal Co-operative, Inc.*, 307 U. S. 533, 541 (1939).

Another District Court in the West similarly has declared § 314(c) unconstitutional with respect to invalidation of claims based on failure to meet the initial recordation requirements of § 314(a) in timely fashion. *Rogers* v. *United States*, 575 F. Supp. 4 (Mont. 1982).

[9] When the nonconstitutional questions have not been passed on by the lower court, we may vacate the decision below and remand with instructions that those questions be decided, see *Youakim* v. *Miller*, 425 U. S. 231 (1976), or we may choose to decide those questions ourselves without benefit of lower court analysis, see *United States* v. *Clark*. The choice between these options depends on the extent to which lower court factfinding and analysis of the nonconstitutional questions will be necessary or useful to our disposition of those questions.

## III

### A

Before the District Court, appellees asserted that the § 314(a) requirement of a filing "prior to December 31 of each year" should be construed to require a filing "on or before December 31." Thus, appellees argued, their December 31 filing had in fact complied with the statute, and the BLM had acted ultra vires in voiding their claims.

Although the District Court did not address this argument, the argument raises a question sufficiently legal in nature that we choose to address it even in the absence of lower court analysis. See, e. g., *United States* v. *Clark, supra.* It is clear to us that the plain language of the statute simply cannot sustain the gloss appellees would put on it. As even counsel for appellees conceded at oral argument, § 314(a) "is a statement that Congress wanted it filed by December 30th. I think that is a clear statement . . . ." Tr. of Oral Arg. 27; see also *id.*, at 37 ("A literal reading of the statute would require a December 30th filing . . ."). While we will not allow a literal reading of a statute to produce a result "demonstrably at odds with the intentions of its drafters," *Griffin* v. *Oceanic Contractors, Inc.*, 458 U. S. 564, 571 (1982), with respect to filing deadlines a literal reading of Congress' words is generally the only proper reading of those words. To attempt to decide whether some date other than the one set out in the statute is the date actually "intended" by Congress is to set sail on an aimless journey, for the purpose of a filing deadline would be just as well served by nearly any date a court might choose as by the date Congress has in fact set out in the statute. "Actual purpose is sometimes unknown," *United States Railroad Retirement Board* v. *Fritz*, 449 U. S. 166, 180 (1980) (STEVENS, J., concurring), and such is the case with filing deadlines; as might be expected, nothing in the legislative history suggests why Congress chose December 30 over December 31,

or over September 1 (the end of the assessment year for mining claims, 30 U. S. C. § 28), as the last day on which the required filings could be made. But "[d]eadlines are inherently arbitrary," while fixed dates "are often essential to accomplish necessary results." *United States* v. *Boyle*, 469 U. S. 241, 249 (1984). Faced with the inherent arbitrariness of filing deadlines, we must, at least in a civil case, apply by its terms the date fixed by the statute. Cf. *United States Railroad Retirement Board* v. *Fritz, supra,* at 179.[10]

Moreover, BLM regulations have made absolutely clear since the enactment of FLPMA that "prior to December 31" means what it says. As the current version of the filing regulations states:

> "The owner of an unpatented mining claim located on Federal lands . . . shall have filed or caused to have been filed *on or before December 30* of each calendar year . . . evidence of annual assessment work performed during the previous assessment year or a notice of intention to hold the mining claim." 43 CFR § 3833.2–1(b)(1) (1984) (emphasis added).

See also 43 CFR § 3833.2–1(a) (1982) (same); 43 CFR § 3833.2–1(a) (1981) (same); 43 CFR § 3833.2–1(a) (1980) (same); 43 CFR § 3833.2–1(a) (1979) (same); 43 CFR § 3833.2–1(a)(1) (1978) ("prior to" Dec. 31); 43 CFR § 3833.2–1(a)(1) (1977) ("prior to" Dec. 31). Leading mining treatises similarly

---

[10] Statutory filing deadlines are generally subject to the defenses of waiver, estoppel, and equitable tolling. See *Zipes* v. *Trans World Airlines, Inc.,* 455 U. S. 385, 392–398 (1982). Whether this general principle applies to deadlines that run in favor of the Government is a question on which we express no opinion today. In addition, no showing has been made that appellees were in any way "*unable* to exercise the usual care and diligence" that would have allowed them to meet the filing deadline or to learn of its existence. See *United States* v. *Boyle,* 469 U. S. 241, 253 (1985) (BRENNAN, J., concurring). Of course, at issue in *Boyle* was an explicit provision in the Internal Revenue Code that provided a reasonable-cause exception to the Code's filing deadlines, while FLPMA contains no analogous provision.

inform claimants that "[i]t is important to note that the filing of a notice of intention or evidence of assessment work must be done *prior* to December 31 of each year, *i. e.*, on or before December 30." 2 American Law of Mining § 7.23D, p. 150.2 (Supp. 1983) (emphasis in original); see also 23 Rocky Mountain Mineral Law Institute 25 (1977) (same). If appellees, who were businessmen involved in the running of a major mining operation for more than 20 years, had any questions about whether a December 31 filing complied with the statute, it was incumbent upon them, as it is upon other businessmen, see *United States* v. *Boyle, supra,* to have checked the regulations or to have consulted an attorney for legal advice. Pursuit of either of these courses, rather than the submission of a last-minute filing, would surely have led appellees to the conclusion that December 30 was the last day on which they could file safely.

In so saying, we are not insensitive to the problems posed by congressional reliance on the words "prior to December 31." See *post,* p. 117 (STEVENS, J., dissenting). But the fact that Congress might have acted with greater clarity or foresight does not give courts a *carte blanche* to redraft statutes in an effort to achieve that which Congress is perceived to have failed to do. "There is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted." *Mobil Oil Corp.* v. *Higginbotham,* 436 U. S. 618, 625 (1978). Nor is the Judiciary licensed to attempt to soften the clear import of Congress' chosen words whenever a court believes those words lead to a harsh result. See *Northwest Airlines, Inc.* v. *Transport Workers,* 451 U. S. 77, 98 (1981). On the contrary, deference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill, generally requires us to assume that "the legislative purpose is expressed by the ordinary meaning of the words used." *Richards* v. *United States,* 369 U. S. 1, 9 (1962). "Going behind the plain language of a statute in search of a possibly contrary congressional intent is 'a step to

be taken cautiously' even under the best of circumstances." *American Tobacco Co.* v. *Patterson,* 456 U. S. 63, 75 (1982) (quoting *Piper* v. *Chris-Craft Industries, Inc.,* 430 U. S. 1, 26 (1977)). When even after taking this step nothing in the legislative history remotely suggests a congressional intent contrary to Congress' chosen words, and neither appellees nor the dissenters have pointed to anything that so suggests, any further steps take the courts out of the realm of interpretation and place them in the domain of legislation. The phrase "prior to" may be clumsy, but its meaning is clear.[11] Under these circumstances, we are obligated to apply the "prior to December 31" language by its terms. See, *e. g., American Tobacco Co.* v. *Patterson, supra,* at 68; *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.,* 447 U. S. 102, 108 (1980).

The agency's regulations clarify and confirm the import of the statutory language by making clear that the annual filings must be made on or before December 30. These regulations provide a conclusive answer to appellees' claim, for where the language of a filing deadline is plain and the agency's construction completely consistent with that language, the agency's construction simply cannot be found "sufficiently unreasonable" as to be unacceptable. *FEC* v. *Democratic Senatorial Campaign Committee,* 454 U. S. 27, 39 (1981).

We cannot press statutory construction "to the point of disingenuous evasion" even to avoid a constitutional question. *Moore Ice Cream Co.* v. *Rose,* 289 U. S. 373, 379 (1933) (Cardozo, J.).[12] We therefore hold that BLM did not act ultra vires in concluding that appellees' filing was untimely.

---

[11] Legislative drafting books are filled with suggestions that the phrase "prior to" be replaced with the word "before," see, *e. g.,* R. Dickerson, Materials on Legal Drafting 293 (1981), but we have seen no suggestion that "prior to" be replaced with "on or before"—a phrase with obviously different substantive content.

[12] We note that the United States Code is sprinkled with provisions that require action "prior to" some date, including at least 14 provisions that contemplate action "prior to December 31." See 7 U. S. C. § 609(b)(5); 12 U. S. C. § 1709(o)(1)(E); 12 U. S. C. § 1823(g); 12 U. S. C. § 1841(a)(5)(A);

## B

Section 314(c) states that failure to comply with the filing requirements of §§ 314(a) and 314(b) "shall be deemed conclusively to constitute an abandonment of the mining claim." We must next consider whether this provision expresses a congressional intent to extinguish all claims for which filings have not been made, or only those claims for which filings have not been made *and* for which the claimants have a specific intent to abandon the claim. The District Court adopted the latter interpretation, and on that basis concluded that § 314(c) created a constitutionally impermissible irrebuttable presumption of abandonment. The District Court reasoned that, once Congress had chosen to make loss of a claim turn on the specific intent of the claimant, a prior hearing and findings on the claimant's intent were constitutionally required before the claim of a nonfiling claimant could be extinguished.

In concluding that Congress was concerned with the specific intent of the claimant even when the claimant had failed

---

22 U. S. C. § 3784(c); 26 U. S. C. § 503(d)(1); 33 U. S. C. § 1319(a)(5)(B); 42 U. S. C. § 415(a)(7)(E)(ii) (1982 ed., Supp. III); 42 U. S. C. § 1962(d)–17(b); 42 U. S. C. § 5614(b)(5); 42 U. S. C. § 7502(a)(2); 42 U. S. C. § 7521 (b)(2); 43 U. S. C. § 1744(a); 50 U. S. C. App. § 1741(b)(1). Dozens of state statutes and local ordinances undoubtedly incorporate similar "prior to December 31" deadlines. In addition, legislatures know how to make explicit an intent to allow action on December 31 when they employ a December 31 date in a statute. See, *e. g.*, 7 U. S. C. § 609(b)(2); 22 U. S. C. §§ 3303 (b)(3)(B) and (c); 43 U. S. C. § 256a.

It is unclear whether the arguments advanced by the dissenters are meant to apply to all of these provisions, or only to some of them; if the latter, we are given little guidance as to how a court is to go about the rather eclectic task of choosing which "prior to December 31" deadlines it can interpret "flexibly." Understandably enough, the dissenters seek to disavow any intent to call all these "prior to December 31" deadlines into question and assure us that *this* is a "unique case," *post*, at 117, n. 4 (POWELL, J., dissenting), involving a "unique factual matrix," *post*, at 128 (STEVENS, J., dissenting). The only thing we can find unique about this particular December 31 deadline is that the dissenters are willing to go through such tortured reasoning to evade it.

to make the required filings, the District Court began from the fact that neither § 314(c) nor the Act itself defines the term "abandonment" as that term appears in § 314(c). The District Court then noted correctly that the common law of mining traditionally has drawn a distinction between "abandonment" of a claim, which occurs only upon a showing of the claimant's intent to relinquish the claim, and "forfeiture" of a claim, for which only noncompliance with the requirements of law must be shown. See, *e. g.*, 2 American Law of Mining § 8.2, pp. 195–196 (1983) (relied upon by the District Court). Given that Congress had not expressly stated in the statute any intent to depart from the term-of-art meaning of "abandonment" at common law, the District Court concluded that § 314(c) was intended to incorporate the traditional common-law distinction between abandonment and forfeiture. Thus, reasoned the District Court, Congress did not intend to cause a forfeiture of claims for which the required filings had not been made, but rather to focus on the claimant's actual intent. As a corollary, the District Court understood the failure to file to have been intended to be merely one piece of evidence in a factual inquiry into whether a claimant had a specific intent to abandon his property.

This construction of the statutory scheme cannot withstand analysis. While reference to common-law conceptions is often a helpful guide to interpreting open-ended or undefined statutory terms, see, *e. g.*, *NLRB* v. *Amax Coal Co.*, 453 U. S. 322, 329 (1981); *Standard Oil Co.* v. *United States*, 221 U. S. 1, 59 (1911), this principle is a guide to legislative intent, not a talisman of it, and the principle is not to be applied in defiance of a statute's overriding purposes and logic. Although § 314(c) is couched in terms of a conclusive presumption of "abandonment," there can be little doubt that Congress intended § 314(c) to cause a forfeiture of all claims for which the filing requirements of §§ 314(a) and 314(b) had not been met.

To begin with, the Senate version of § 314(c) provided that any claim not properly recorded "shall be conclusively pre-

sumed to be abandoned and shall be void." S. 507, 94th Cong., 1st Sess., § 311 (1975).[13] The Committee Report accompanying S. 507 repeatedly indicated that failure to comply with the filing requirements would make a claim "void." See S. Rep. No. 94–583, pp. 65, 66 (1975). The House legislation and Reports merely repeat the statutory language without offering any explanation of it, but it is clear from the Conference Committee Report that the undisputed intent of the Senate—to make "void" those claims for which proper filings were not timely made—was the intent of both Chambers. The Report stated: "Both the Senate bill and House amendments provided for recordation of mining claims and for *extinguishment* of abandoned claims." H. R. Rep. No. 94–1724, p. 62 (1976) (emphasis added).

In addition, the District Court's construction fails to give effect to the "deemed conclusively" language of § 314(c). If the failure to file merely shifts the burden to the claimant to prove that he intends to keep the claim, nothing "conclusive" is achieved by § 314(c). The District Court sought to avoid this conclusion by holding that § 314(c) does extinguish automatically those claims for which *initial* recordings, as opposed to annual filings, have not been made; the District Court attempted to justify its distinction between initial recordings and annual filings on the ground that the dominant purpose of § 314(c) was to avoid forcing BLM to the "awesome task of searching every local title record" to establish initially a federal recording system. 573 F. Supp., at 477. Once this purpose had been satisfied by an initial recording, the primary purposes of the "deemed conclusively" language, in the District Court's view, had been met. But the clear language of § 314(c) admits of no distinction between

---

[13] The Senate bill required only initial recordings, not annual filings, but this factor is not significant in light of the actions of the Conference Committee; the clear structure of the Senate bill was to impose the sanction of claim extinguishment on those who failed to make whatever filings federal law required.

initial recordings and annual filings: failure to do either "shall be deemed conclusively to constitute an abandonment." And the District Court's analysis of the purposes of § 314(c) is also misguided, for the annual filing requirements serve a purpose similar to that of the initial recording requirement; millions of claims undoubtedly have now been recorded, and the presence of an annual filing obligation allows BLM to keep the system established in § 314 up to date on a yearly basis. To put the burden on BLM to keep this system current through its own inquiry into the status of recorded claims would lead to a situation similar to that which led Congress initially to make the federal recording system self-executing. The purposes of a self-executing recording system are implicated similarly, if somewhat less substantially, by both the annual filing obligation and the initial recording requirement, and the District Court was not empowered to thwart these purposes or the clear language of § 314(c) by concluding that § 314(c) was actually concerned with only initial recordings.

For these reasons, we find that Congress intended in § 314(c) to extinguish those claims for which timely filings were not made. Specific evidence of intent to abandon is simply made irrelevant by § 314(c); the failure to file on time, in and of itself, causes a claim to be lost. See *Western Mining Council* v. *Watt*, 643 F. 2d 618, 628 (CA9 1981).

## C

A final statutory question must be resolved before we turn to the constitutional holding of the District Court. Relying primarily on *Hickel* v. *Oil Shale Corp.*, 400 U. S. 48 (1970), the District Court held that, even if the statute required a filing on or before December 30, appellees had "substantially complied" by filing on December 31. We cannot accept this view of the statute.

The notion that a filing deadline can be complied with by filing sometime after the deadline falls due is, to say the

least, a surprising notion, and it is a notion without limiting principle. If 1-day late filings are acceptable, 10-day late filings might be equally acceptable, and so on in a cascade of exceptions that would engulf the rule erected by the filing deadline; yet regardless of where the cutoff line is set, some individuals will always fall just on the other side of it. Filing deadlines, like statutes of limitations, necessarily operate harshly and arbitrarily with respect to individuals who fall just on the other side of them, but if the concept of a filing deadline is to have any content, the deadline must be enforced. "Any less rigid standard would risk encouraging a lax attitude toward filing dates," *United States* v. *Boyle*, 469 U. S., at 249. A filing deadline cannot be complied with, substantially or otherwise, by filing late—even by one day. *Hickel* v. *Oil Shale Corp.*, *supra*, does not support a contrary conclusion. *Hickel* suggested, although it did not hold, that failure to meet the annual assessment work requirements of the general mining laws, 30 U. S. C. § 28, which require that "not less than $100 worth of labor shall be performed or improvements made during each year," would not render a claim automatically void. Instead, if an individual complied substantially but not fully with the requirement, he might under some circumstances be able to retain possession of his claim.

These suggestions in *Hickel* do not afford a safe haven to mine owners who fail to meet their filing obligations under any federal mining law. Failure to comply fully with the physical requirement that a certain amount of work be performed each year is significantly different from the complete failure to file on time documents that federal law commands be filed. In addition, the general mining laws at issue in *Hickel* do not clearly provide that a claim will be lost for failure to meet the assessment work requirements. Thus, it was open to the Court to conclude in *Hickel* that Congress had intended to make the assessment work requirement merely an indicium of a claimant's specific intent to retain a

claim. Full compliance with the assessment work require-
ments would establish conclusively an intent to keep the
claim, but less than full compliance would not by force of law
operate to deprive the claimant of his claim. Instead, less
than full compliance would subject the mine owner to a case-
by-case determination of whether he nonetheless intended to
keep his claim. See *Hickel, supra,* at 56–57.

In this case, the statute explicitly provides that failure to
comply with the applicable filing requirements leads auto-
matically to loss of the claim. See Part II–B, *supra.* Thus,
Congress has made it unnecessary to ascertain whether the
individual in fact intends to abandon the claim, and there is
no room to inquire whether substantial compliance is indica-
tive of the claimant's intent—intent is simply irrelevant if the
required filings are not made. *Hickel*'s discussion of sub-
stantial compliance is therefore inapposite to the statutory
scheme at issue here. As a result, *Hickel* gives miners no
greater latitude with filing deadlines than other individuals
have.[14]

---

[14] Since 1982, BLM regulations have provided that filings due on or
before December 30 will be considered timely if postmarked on or before
December 30 and received by BLM by the close of business on the follow-
ing January 19. 43 CFR § 3833.0–5(m) (1983). Appellees and the dissent-
ers attempt to transform this regulation into a blank check generally au-
thorizing "substantial compliance" with the filing requirements. We
disagree for two reasons. First, the regulation was not in effect when
appellees filed in 1980; it therefore cannot now be relied on to validate a
purported "substantial compliance" in 1980. Second, that an agency has
decided to take account of holiday mail delays by treating as timely filed a
document postmarked on the statutory filing date does not require the
agency to accept all documents hand-delivered any time before January 19.
The agency rationally could decide that either of the options in this sort of
situation—requiring mailings to be received by the same date that hand-
deliveries must be made or requiring mailings to be postmarked by that
date—is a sound way of administering the statute.

JUSTICE STEVENS further suggests that BLM would have been well
within its authority to promulgate regulations construing the statute to
allow for December 31 filings. Assuming the correctness of this sugges-

## IV

Much of the District Court's constitutional discussion necessarily falls with our conclusion that § 314(c) automatically deems forfeited those claims for which the required filings are not timely made. The District Court's invalidation of the statute rested heavily on the view that § 314(c) creates an "irrebuttable presumption that mining claims are abandoned if the miner fails to timely file" the required documents—that the statute presumes a failure to file to signify a specific intent to abandon the claim. But, as we have just held, § 314(c) presumes nothing about a claimant's actual intent; the statute simply and conclusively deems such claims to be forfeited. As a forfeiture provision, § 314(c) is not subject to the individualized hearing requirement of such irrebuttable presumption cases as *Vlandis* v. *Kline*, 412 U. S. 441 (1973), or *Cleveland Bd. of Education* v. *LaFleur*, 414 U. S. 632 (1974), for there is nothing to suggest that, in enacting § 314(c), Congress was in any way concerned with whether a particular claimant's tardy filing or failure to file indicated an actual intent to abandon the claim.

There are suggestions in the District Court's opinion that, even understood as a forfeiture provision, § 314(c) might be unconstitutional. We therefore go on to consider whether automatic forfeiture of a claim for failure to make annual filings is constitutionally permissible. The framework for analysis of this question, in both its substantive and procedural dimensions, is set forth by our recent decision in *Texaco, Inc.* v. *Short*, 454 U. S. 516 (1982). There we upheld a state statute pursuant to which a severed mineral interest that had not been used for a period of 20 years automatically lapsed and reverted to the current surface owner of the property, unless the mineral owner filed a statement of

---

tion, the fact that two interpretations of a statute are equally reasonable suggests to us that the agency's interpretation is sufficiently reasonable as to be acceptable. See *FEC* v. *Democratic Senatorial Campaign Committee*, 454 U. S. 27, 39 (1981).

claim in the county recorder's office within 2 years of the statute's passage.

## A

Under *Texaco*, we must first address the question of affirmative legislative power: whether Congress is authorized to "provide that property rights of this character shall be extinguished if their owners do not take the affirmative action required by the" statute. *Id.*, at 525. Even with respect to vested property rights, a legislature generally has the power to impose new regulatory constraints on the way in which those rights are used, or to condition their continued retention on performance of certain affirmative duties. As long as the constraint or duty imposed is a reasonable restriction designed to further legitimate legislative objectives, the legislature acts within its powers in imposing such new constraints or duties. See, *e. g., Village of Euclid* v. *Ambler Realty, Co.*, 272 U. S. 365 (1926); *Turner* v. *New York*, 168 U. S. 90, 94 (1897); *Vance* v. *Vance*, 108 U. S. 514, 517 (1883); *Terry* v. *Anderson*, 95 U. S. 628 (1877). "[L]egislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations." *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1, 16 (1976) (citations omitted).

This power to qualify existing property rights is particularly broad with respect to the "character" of the property rights at issue here. Although owners of unpatented mining claims hold fully recognized possessory interests in their claims, see *Best* v. *Humboldt Placer Mining Co.*, 371 U. S. 334, 335 (1963), we have recognized that these interests are a "unique form of property." *Ibid.* The United States, as owner of the underlying fee title to the public domain, maintains broad powers over the terms and conditions upon which the public lands can be used, leased, and acquired. See, *e. g., Kleppe* v. *New Mexico*, 426 U. S. 529, 539 (1976).

> "A mining location which has not gone to patent is of no higher quality and no more immune from attack and in-

> vestigation than are unpatented claims under the homestead and kindred laws. If valid, it gives to the claimant certain exclusive possessory rights, and so do homestead and desert claims. But no right arises from an invalid claim of any kind. All must conform to the law under which they are initiated; otherwise they work an unlawful private appropriation in derogation of the rights of the public." *Cameron* v. *United States*, 252 U. S. 450, 460 (1920).

Claimants thus must take their mineral interests with the knowledge that the Government retains substantial regulatory power over those interests. Cf. *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.*, 459 U. S. 400, 413 (1983). In addition, the property right here is the right to a flow of income from production of the claim. Similar vested economic rights are held subject to the Government's substantial power to regulate for the public good the conditions under which business is carried out and to redistribute the benefits and burdens of economic life. See, *e. g., National Railroad Passenger Corporation* v. *Atchison, T. & S. F. R. Co.*, 470 U. S. 451, 468–469 (1985); *Usery* v. *Turner Elkhorn Mining Co., supra;* see generally *Walls* v. *Midland Carbon Co.*, 254 U. S. 300, 315 (1920) ("[I]n the interest of the community, [government may] limit one [right] that others may be enjoyed").

Against this background, there can be no doubt that Congress could condition initial receipt of an unpatented mining claim upon an agreement to perform annual assessment work and make annual filings. That this requirement was applied to claims already located by the time FLPMA was enacted and thus applies to vested claims does not alter the analysis, for any "retroactive application of [FLPMA] is supported by a legitimate legislative purpose furthered by rational means." *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.*, 467 U. S. 717, 729 (1984). The purposes of applying FLPMA's filing provisions to claims located before the Act was passed—to rid federal lands of stale mining claims and to

provide for centralized collection by federal land managers of comprehensive and up-to-date information on the status of recorded but unpatented mining claims—are clearly legitimate. In addition, § 314(c) is a reasonable, if severe, means of furthering these goals; sanctioning with loss of their claims those claimants who fail to file provides a powerful motivation to comply with the filing requirement, while automatic invalidation for noncompliance enables federal land managers to know with certainty and ease whether a claim is currently valid. Finally, the restriction attached to the continued retention of a mining claim imposes the most minimal of burdens on claimants; they must simply file a paper once a year indicating that the required assessment work has been performed or that they intend to hold the claim.[15] Indeed,

---

[15] Appellees suggest that *Texaco, Inc.* v. *Short,* 454 U. S. 516 (1982), further requires that the restriction imposed be substantively reasonable in the sense that it adequately relate to some common-law conception of the nature of the property right involved. Thus, appellees point to the fact that, in *Texaco,* failure to file could produce a forfeiture only if, in addition, the mineral interest had lain dormant for 20 years; according to appellees, conjunction of a 20-year dormancy period with failure to file a statement of claim sufficiently indicated abandonment, as that term is understood at common law, to justify the statute.

Common-law principles do not, however, entitle an individual to retain his property until the common law would recognize it as abandoned. Legislatures can enact substantive rules of law that treat property as forfeited under conditions that the common law would not consider sufficient to indicate abandonment. See *Hawkins* v. *Barney's Lessee,* 5 Pet. 457, 467 (1831) ("What is the evidence of an individual having abandoned his rights or property? It is clear that the subject is one over which every community is at liberty to make a rule for itself"). As long as proper notice of these rules exists, and the burdens they impose are not so wholly disproportionate to the burdens other individuals face in a highly regulated society that some people are being forced "alone to bear public burdens which, in all fairness and justice, must be borne by the public as a whole," *Armstrong* v. *United States,* 364 U. S. 40, 49 (1960), the burden imposed is a reasonable restriction on the property right. Here Congress has chosen to redefine the way in which an unpatented mining claim can be lost through imposition of a filing requirement that serves valid public objec-

appellees could have fully protected their interests against the effect of the statute by taking the minimal additional step of patenting the claims. As a result, Congress was well within its affirmative powers in enacting the filing requirement, in imposing the penalty of extinguishment set forth in §314(c), and in applying the requirement and sanction to claims located before FLPMA was passed.

## B

We look next to the substantive effect of §314(c) to determine whether Congress is nonetheless barred from enacting it because it works an impermissible intrusion on constitutionally protected rights. With respect to the regulation of private property, any such protection must come from the Fifth Amendment's proscription against the taking of private property without just compensation. On this point, however, *Texaco* is controlling: "this Court has never required [Congress] to compensate the owner for the consequences of his own neglect." 454 U. S., at 530. Appellees failed to inform themselves of the proper filing deadline and failed to file in timely fashion the documents required by federal law. Their property loss was one appellees could have avoided with minimal burden; it was their failure to file on time— not the action of Congress—that caused the property right to be extinguished. Regulation of property rights does not "take" private property when an individual's reasonable, investment-backed expectations can continue to be realized as long as he complies with reasonable regulatory restrictions the legislature has imposed. See, *e. g., Miller* v. *Schoene,* 276 U. S. 272, 279–280 (1928); *Terry* v. *Anderson,* 95 U. S., at 632–633; cf. *Hawkins* v. *Barney's Lessee,* 5 Pet. 457, 465

tives, imposes the most minimal of burdens on property holders, and takes effect only after appellees have had sufficient notice of their need to comply and a reasonable opportunity to do so. That the filing requirement meets these standards is sufficient, under *Texaco,* to make it a reasonable restriction on the continued retention of the property right.

(1831) ("What right has any one to complain, when a reasonable time has been given him, if he has not been vigilant in asserting his rights?").

## C

Finally, the Act provides appellees with all the process that is their constitutional due. In altering substantive rights through enactment of rules of general applicability, a legislature generally provides constitutionally adequate process simply by enacting the statute, publishing it, and, to the extent the statute regulates private conduct, affording those within the statute's reach a reasonable opportunity both to familiarize themselves with the general requirements imposed and to comply with those requirements. *Texaco*, 454 U. S., at 532; see also *Anderson National Bank* v. *Luckett*, 321 U. S. 233, 243 (1944); *North Laramie Land Co.* v. *Hoffman*, 268 U. S. 276, 283 (1925). Here there can be no doubt that the Act's recording provisions meet these minimal requirements. Although FLPMA was enacted in 1976, owners of existing claims, such as appellees, were not required to make an initial recording until October 1979. This 3-year period, during which individuals could become familiar with the requirements of the new law, surpasses the 2-year grace period we upheld in the context of a similar regulation of mineral interests in *Texaco*. Moreover, the specific annual filing obligation at issue in this case is not triggered until the year after which the claim is recorded initially; thus, every claimant in appellees' position already has filed once before the annual filing obligations come due. That these claimants already have made one filing under the Act indicates that they know, or must be presumed to know, of the existence of the Act and of their need to inquire into its demands.[16] The

---

[16] As a result, this is not a case in which individual notice of a statutory change must be given because a statute is "sufficiently unusual in character, and triggered in circumstances so commonplace, that an average citizen would have no reason to regard the triggering event as calling for a heightened awareness of one's legal obligations." *Texaco*, 454 U. S., at 547 (BRENNAN, J., dissenting).

requirement of an annual filing thus was not so unlikely to come to the attention of those in the position of appellees as to render unconstitutional the notice provided by the 3-year grace period.[17]

Despite the fact that FLPMA meets the three standards laid down in *Texaco* for the imposition of new regulatory restraints on existing property rights, the District Court seemed to believe that individualized notice of the filing deadlines was nonetheless constitutionally required. The District Court felt that such a requirement would not be "overly burdensome" to the Government and would be of great benefit to mining claimants. The District Court may well be right that such an individualized notice scheme would be a sound means of administering the Act.[18] But in the regulation of private property rights, the Constitution offers the courts no warrant to inquire into whether some other scheme might be more rational or desirable than the one chosen by Congress; as long as the legislative scheme is *a* rational way of reaching Congress' objectives, the efficacy of alternative routes is for Congress alone to consider. "It is enough to say that the Act approaches the problem of [developing a national recording system] rationally; whether a [different notice scheme] would have been wiser or more practical under the circumstances is not a question of constitutional dimension." *Usery* v. *Turner Elkhorn Mining*, 428 U. S., at 19. Because we deal here with purely economic legislation, Congress was entitled to conclude that it was preferable

---

[17] BLM does provide for notice and a hearing on the adjudicative fact of whether the required filings were actually made, and appellees availed themselves of this process by appealing, to the Department of Interior Board of Land Appeals, the BLM order that extinguished their claims for failure to make a timely filing.

[18] In the exercise of its administrative discretion, BLM for the last several years has chosen to mail annual reminder notices to claimants several months before the end of the year; according to the Government, these notices state: "[Y]ou must file on or before 12/30 [of the relevant year]. Failure to file timely with the proper BLM office will render your claim abandoned." Brief for Appellants 31–32, n. 22.

to place a substantial portion of the burden on claimants to make the national recording system work. See *ibid.; Weinberger* v. *Salfi*, 422 U. S. 749 (1975); *Mourning* v. *Family Publications Service, Inc.*, 411 U. S. 356 (1973). The District Court therefore erred in invoking the Constitution to supplant the valid administrative scheme established by Congress. The judgment below is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, concurring.

I agree that the District Court erred in holding that § 314(c) of the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U. S. C. § 1744(c), violates due process by creating an "irrebuttable presumption" of abandonment. Whatever the force of *Vlandis* v. *Kline*, 412 U. S. 441 (1973), beyond the facts underlying that case, I believe that § 314(c) comports with due process under the analysis of our later decision in *Weinberger* v. *Salfi*, 422 U. S. 749 (1975). Because I also believe that the statute does not otherwise violate the Fifth Amendment and that the District Court erred in its alternative holding that substantial compliance satisfies the filing requirements of § 314 and corresponding regulations, I agree that the judgment below must be reversed. Nonetheless, I share many of the concerns expressed in the dissenting opinions of JUSTICE POWELL and JUSTICE STEVENS. If the facts are as alleged by appellees, allowing the Bureau of Land Management (BLM) to extinguish active mining claims that appellees have owned and worked for more than 20 years would seem both unfair and inconsistent with the purposes underlying FLPMA.

The Government has not disputed that appellees sought in good faith to comply with the statutory deadline. Appellees contend that in order to meet the requirements of § 314, they contacted the BLM and were informed by agency personnel

that they could file the required materials on December 31, 1980. Appellees apparently relied on this advice and hand-delivered the appropriate documents to the local BLM office on that date. The BLM accepted the documents for filing, but some three months later sent appellees a notice stating that their mining claims were "abandoned and void" because the filing was made on, rather than prior to, December 31, 1980. Although BLM regulations clarify the filing deadlines contained in § 314, the existence of those regulations does not imply that appellees were unjustified in their confusion concerning the deadlines or in their reliance on the advice provided by BLM's local office. The BLM itself in 1978 issued an explanatory pamphlet stating that the annual filings were to be made "on or before December 31" of each year. *Ante,* at 89–90, n. 7. Moreover, the BLM evidently has come to understand the need to clarify the nature of the annual filing requirement, because it now sends reminder notices every year to holders of recorded mining claims warning them that the deadline is approaching and that filings must be made on or before December 30.

The unusual facts alleged by appellees suggest that the BLM's actions might estop the Government from relying on § 314(c) to obliterate a property interest that has provided a family's livelihood for decades. The Court properly notes that the estoppel issue was not addressed by the District Court and will be open on remand. *Ante,* at 89–90, n. 7. In this regard, I merely note that in my view our previous decisions do not preclude application of estoppel in this context. In *Heckler* v. *Community Health Services of Crawford County, Inc.,* 467 U. S. 51 (1984), we expressly declined to adopt "a flat rule that estoppel may not in any circumstances run against the Government." *Id.,* at 60. Such a rule was unnecessary to the decision in that case, and we noted our reluctance to hold that "there are *no cases* in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervail-

ing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government." *Id.*, at 60–61 (footnote omitted).

Although "it is well settled that the Government may not be estopped on the same terms as any other litigant," *id.*, at 60 (footnote omitted), we have never held that the Government can extinguish a vested property interest that has been legally held and actively maintained for more than 20 years merely because the private owners relied on advice from agency personnel concerning a poorly worded statutory deadline and consequently missed a filing deadline by one day. Thus, if the District Court ultimately determines that appellees reasonably relied on communications from the BLM in making their annual filing on December 31, 1980, our previous decisions would not necessarily bar application of the doctrine of equitable estoppel. Accordingly, the fact that the Court reverses the decision of the District Court does not establish that appellees must ultimately forfeit their mining claims.

JUSTICE POWELL, dissenting.

I agree with much of JUSTICE STEVENS' dissent. I write separately only because under the special circumstances of this case I do not believe it necessary to decide what Congress actually intended. Even if the Court is correct in believing that Congress intended to require filings on or before the next-to-the-last day of the year, rather than, more reasonably, by the end of the calendar year itself, the statutory deadline is too uncertain to satisfy constitutional requirements. It simply fails to give property holders clear and definite notice of what they must do to protect their existing property interests.

As the Court acknowledges, *ante*, at 86, the Government since the 19th century has encouraged its citizens to discover and develop certain minerals on the public lands. Under the general mining laws, 30 U. S. C. § 22 *et seq.*, an individual who locates a mining claim has the right of exclusive posses-

sion of the land for mining purposes and may extract and sell minerals he finds there without paying a royalty to the Federal Government. § 26. After making a valuable mineral discovery, the claimant may hold the claim so long as he performs $100 worth of assessment work each year. § 28. If he performs certain additional conditions, the claimant may patent the claim for a nominal sum and thereby obtain further rights over the land and minerals. See § 29. Until recently, there were no federal recordation requirements.

Faced with the uncertainty stale mining claims had created as to property rights on public lands, Congress enacted § 314 of the Federal Land Policy and Management Act of 1976, 90 Stat. 2769, 43 U. S. C. § 1744.[1] This provision required existing claimholders to record their claims in order to retain them. More specifically, it required that "within the three-year period following October 21, 1976 and prior to December 31 of each year thereafter," § 1744(a), claimholders file with

---

[1] Section 314(a), 43 U. S. C. § 1744(a), states in its entirety:

"Recordation of Mining Claims

"(a) Filing requirements

"The owner of an unpatented lode or placer mining claim located prior to October 21, 1976, shall, within the three-year period following October 21, 1976 and prior to December 31 of each year thereafter, file the instruments required by paragraphs (1) and (2) of this subsection. The owner of an unpatented lode or placer mining claim located after October 21, 1976 shall, prior to December 31 of each year following the calendar year in which the said claim was located, file the instruments required by paragraphs (1) and (2) of this subsection:

"(1) File for record in the office where the location notice or certificate is recorded either a notice of intention to hold the mining claim (including but not limited to such notices as are provided by law to be filed when there has been a suspension or deferment of annual assessment work), an affidavit of assessment work performed thereon, on [sic] a detailed report provided by section 28–1 of title 30, relating thereto.

"(2) File in the office of the Bureau designated by the Secretary a copy of the official record of the instrument filed or recorded pursuant to paragraph (1) of this subsection, including a description of the location of the mining claim sufficient to locate the claimed lands on the ground."

the Bureau of Land Management (BLM) a copy of a notice of intention to retain their claims, an affidavit of assessment work, or a special form, §§ 1744(a)(1) and (2). Failure to make either the initial or a subsequent yearly filing was to "be deemed conclusively to constitute an abandonment of the mining claim . . . ." § 1744(c).

Appellees (the Lockes) are owners of 10 unpatented mining claims on federal land in Nevada. Appellees' predecessors located these claims in 1952 and 1954, and appellees have, since they purchased the claims in 1960, earned their livelihood by producing gravel and other building materials from them. From 1960 to the present, they have produced approximately $4 million worth of materials. During the 1979–1980 assessment year alone, they produced gravel and other materials worth more than $1 million. In no sense were their claims stale.

The Lockes fully complied with § 314's initial recordation requirement by properly filing a notice of location on October 19, 1979. In order to ascertain how to comply with the subsequent yearly recordation requirements, the Lockes sent their daughter, who worked in their business office, to the Ely, Nevada, office of the BLM. There she inquired into how and when they should file the assessment notice and was told, among other things, that the documents should be filed at the Reno office "on or before December 31, 1980." 573 F. Supp. 472, 474 (Nev. 1983). Following this advice, the Lockes hand-delivered their documents at the Reno office on that date. On April 4, 1981, they received notice from the BLM that their mining claims were "abandoned and void," App. to Juris. Statement 22a, because they had filed *on*, rather than *prior to*, December 31.[2] It is this 1-day differ-

_____

[2] The notice from the BLM also stated that "[s]ubject to valid intervening rights of third parties or the United States void or abandoned claims or sites may be relocated and, based on the new location date, the appropriate instruments may be refiled within the time periods prescribed by the regulations." App. to Juris. Statement 22a. Unlike most claimants, however,

ence in good-faith interpretation of the statutory deadline that gives rise to the present controversy.

JUSTICE STEVENS correctly points to a number of circumstances that cast doubt both on the care with which Congress drafted § 314 and on its meaning. Specifically, he notes that (i) the section does not clearly describe *what* must be filed, let alone *when* it must be filed; (ii) BLM's rewording of the deadline in its implementing regulations, 43 CFR § 3833.2–1(a)(1) (1984), indicates that the BLM itself considered the statutory deadline confusing; (iii) lest there be any doubt that the BLM recognized this possible confusion, even it had described the section in a pamphlet distributed to miners in 1978 as requiring filing *"on or before December 31"*; (iv) BLM, charged with enforcing the section, has interpreted it quite flexibly; and (v) irrationally requiring property holders to file by one day before the end of the year, rather than by the end of the year itself, creates "a trap for the unwary," *post*, at 123. As JUSTICE STEVENS also states, these facts, particularly the last, suggest not only that Congress drafted § 314 inartfully but also that Congress may actually have intended to require filing "on or before," not "prior to," December 31. This is certainly the more reasonable interpretation of congressional intent and is consistent with all the policies of the Act.

I do not believe, however, that given the special circumstances of this case we need determine what Congress actually intended. As the Court today recognizes, the Takings Clause imposes some limitations on the Government's power to impose forfeitures. *Ante*, at 103–108. In *Texaco, Inc.* v. *Short*, 454 U. S. 516 (1982), we identified one of the most important of these limitations when we stated that "the State has the power to condition the permanent retention of [a]

---

the Lockes were unable to relocate their claims because the Common Varieties Act of 1955, 30 U. S. C. § 611 *et seq.*, had withdrawn deposits of common building materials from coverage of the general mining laws. To them, forfeiture meant not relocation and refiling, but rather irrevocable loss of their claims—the source of their livelihood.

property right on the performance of *reasonable conditions
. . . ." Id.,* at 526 (emphasis added); accord, *Jackson* v.
*Lamphire,* 3 Pet. 280, 290 (1830) ("Cases may occur where
the [forfeiture] provisio[n] . . . may be so unreasonable as to
amount to a denial of a right, and call for the interposition of
the court . . ."). Furthermore, conditions, like those here,
imposed after a property interest is created must also meet
due process standards. *Usery* v. *Turner Elkhorn Mining
Co.,* 428 U. S. 1, 16–17 (1976). These standards require,
among other things, that there be no question as to what
actions an individual must take to protect his interests.
*Texaco, Inc.* v. *Short, supra,* at 532–533. Together the
Takings and Due Process Clauses prevent the Government
from depriving an individual of property rights arbitrarily.

In the present case there is no claim that a yearly filing
requirement is itself unreasonable. Rather, the claim arises
from the fact that the language "prior to December 31" cre-
ates uncertainty as to when an otherwise reasonable filing
period ends.[3] Given the natural tendency to interpret this
phrase as "by the end of the calendar year," rather than "on
or before the next-to-the-last day of the calendar year," I
believe this uncertainty violated the standard of certainty

---

[3] The Court believes it is "obligated to apply the 'prior to December 31'
language by its terms" because "its meaning is clear." *Ante,* at 96. Such
clarity, however, is not to be found in the words themselves. Courts, for
example, have used these same words in similar contexts clearly to mean
"by the end of the year," *e. g., AMF Inc.* v. *Jewett,* 711 F. 2d 1096, 1108,
1115 (CA1 1983); *Bay State Gas Co.* v. *Commissioner,* 689 F. 2d 1, 2 (CA1
1982), or have contrasted them with other phrases such as "[f]rom January
1," *NYSA–ILA Vacation & Holiday Fund* v. *Waterfront Comm'n of New
York Harbor,* 732 F. 2d 292, 295, and n. 6 (CA2), cert. denied, 469 U. S.
852 (1984), or "after December 31," *Peabody Coal Co.* v. *Lowis,* 708 F. 2d
266, 267, n. 3 (CA7 1983), in ways that strongly suggest this meaning.
Various administrative agencies have also followed this same usage in
promulgating their regulations. *E. g.,* 24 CFR § 570.423(b) (1984); 31
CFR § 515.560(i) (1984); 40 CFR § 52.1174 (1984).

and definiteness that the Constitution requires. The statement in at least one of the Government's own publications that filing was required "on or before December 31," Department of the Interior, Staking a Mining Claim on Federal Lands 10 (1978), supports this conclusion. Terminating a property interest because a property holder reasonably believed that under the statute he had an additional day to satisfy any filing requirements is no less arbitrary than terminating it for failure to satisfy these same conditions in an unreasonable amount of time. Cf. *Wilson* v. *Iseminger*, 185 U. S. 55, 62 (1902); *Terry* v. *Anderson*, 95 U. S. 628, 632–633 (1877). Although the latter may rest on impossibility, the former rests on good-faith performance a day late of what easily could have been performed the day before. Neither serves a purpose other than forcing an arbitrary forfeiture of property rights to the State.

I believe the Constitution requires that the law inform the property holder with more certainty and definiteness than did § 314 when he must fulfill any recording requirements imposed after a property interest is created. Given the statutory uncertainty here, I would find a forfeiture imposed for filing on December 31 to be invalid.[4]

I accordingly dissent.

JUSTICE STEVENS, with whom JUSTICE BRENNAN joins, dissenting.

The Court's opinion is contrary to the intent of Congress, engages in unnecessary constitutional adjudication, and unjustly creates a trap for unwary property owners. First, the choice of the language "prior to December 31" when read in

---

[4] Parties, of course, ordinarily are bound to the consequences of their failing strictly to meet statutory deadlines. This is true, for example, as to statutes of limitations and other filing deadlines clearly specified. Because of the special circumstances JUSTICE STEVENS identifies and the constitutional concerns identified above, this case is unique.

118

context in 43 U. S. C. § 1744(a)[1] is, at least, ambiguous, and, at best, "the consequence of a legislative *accident,* perhaps caused by nothing more than the unfortunate fact that Con-

---

[1] The full text of 43 U. S. C. § 1744 reads as follows:

"Recordation of Mining Claims

"(a) Filing requirements

"The owner of an unpatented lode or placer mining claim located prior to October 21, 1976, shall, within the three-year period following October 21, 1976 and prior to December 31 of each year thereafter, file the instruments required by paragraphs (1) and (2) of this subsection. The owner of an unpatented lode or placer mining claim located after October 21, 1976 shall, prior to December 31 of each year following the calendar year in which the said claim was located, file the instruments required by paragraphs (1) and (2) of this subsection:

"(1) File for record in the office where the location notice or certificate is recorded either a notice of intention to hold the mining claim (including but not limited to such notices as are provided by law to be filed when there has been a suspension or deferment of annual assessment work), an affidavit of assessment work performed thereon, on a detailed report provided by section 28–1 of title 30, relating thereto.

"(2) File in the office of the Bureau designated by the Secretary a copy of the official record of the instrument filed or recorded pursuant to paragraph (1) of this subsection, including a description of the location of the mining claim sufficient to locate the claimed lands on the ground.

"(b) Additional filing requirements

"The owner of an unpatented lode or placer mining claim or mill or tunnel site located prior to October 21, 1976 shall, within the three-year period following October 21, 1976, file in the office of the Bureau designated by the Secretary a copy of the official record of the notice of location or certificate of location, including a description of the location of the mining claim or mill or tunnel site sufficient to locate the claimed lands on the ground. The owner of an unpatented lode or placer mining claim or mill or tunnel site located after October 21, 1976 shall, within ninety days after the date of location of such claim, file in the office of the Bureau designated by the Secretary a copy of the official record of the notice of location or certificate of location, including a description of the location of the mining claim or mill or tunnel site sufficient to locate the claimed lands on the ground.

"(c) Failure to file as constituting abandonment; defective or untimely filing

"The failure to file such instruments as required by subsections (a) and (b) of this section shall be deemed conclusively to constitute an abandon-

gress is too busy to do all of its work as carefully as it should."[2]   In my view, Congress actually intended to authorize an annual filing at any time prior to the close of business on December 31st, that is, prior to the end of the calendar year to which the filing pertains.[3]   Second, even if Congress irrationally intended that the applicable deadline for a calendar year should end *one day before* the end of the calendar year that has been recognized since the amendment of the Julian Calendar in 8 B.C., it is clear that appellees have substantially complied with the requirements of the statute, in large part because the Bureau of Land Management has issued interpreting regulations that recognize sub-

---

ment of the mining claim or mill or tunnel site by the owner; but it shall not be considered a failure to file if the instrument is defective or not timely filed for record under other Federal laws permitting filing or recording thereof, or if the instrument is filed for record by or on behalf of some but not all of the owners of the mining claim or mill or tunnel site.

"(d) Validity of claims, waiver of assessment, etc., as unaffected

"Such recordation or application by itself shall not render valid any claim which would not be otherwise valid under applicable law.   Nothing in this section shall be construed as a waiver of the assessment and other requirements of such law."

[2] *Delaware Tribal Business Committee* v. *Weeks*, 430 U. S. 73, 97 (1977) (STEVENS, J., dissenting) (emphasis added).

[3] This view was expressed at the Rocky Mountain Mineral Law Institute in July 1977:

"It is plain that Congress intended the filing requirement to expire with the last day of the year, but inartful draftsmanship requires all filings under Subsection 314(a) of the Act to be made on or before December 30th. Such is the result of the unfortunate use of the words 'prior to December 31.'   And since December 31st bears no relationship to the assessment year, which ends at noon on September 1st of each year, the statutory requirement that the locator shall file the necessary documents on or before December 30th of each year following the calendar year in which a claim was located, means that where a claim is located after noon on September 1st in any calendar year, the locator must file in the next full calendar year a notice of intention to hold, because no assessment work requirement has yet arisen."   Sherwood, Mining-claim Recordation and Prospecting under The Federal Land Policy and Management Act of 1976, 23 Rocky Mountain Mineral Law Institute 1, 25 (1977) (footnotes omitted).

stantial compliance. Further, the Court today violates not only the long-followed principle that a court should "not pass on the constitutionality of an Act of Congress if a construction of the statute is fairly possible by which the question may be avoided,"[4] but also the principle that a court should "not decide a constitutional question if there is some other ground upon which to dispose of the case."[5]

## I

Congress enacted § 314 of the Federal Land Policy and Management Act to establish for federal land planners and managers a federal recording system designed to cope with the problem of stale claims, and to provide "an easy way of discovering which Federal lands are subject to either valid or invalid mining claim locations."[6] I submit that the appellees' actions in this case did not diminish the importance of these congressional purposes; to the contrary, their actions were entirely consistent with the statutory purposes, despite the confusion created by the "inartful draftsmanship" of the statutory language.[7]

A careful reading of § 314 discloses at least three respects in which its text cannot possibly reflect the actual intent of Congress. First, the description of what must be filed in the initial filing and subsequent annual filings is quite obviously garbled. Read literally, § 314(a)(2) seems to require that a

---

[4] *United States* v. *Clark*, 445 U. S. 23, 27 (1980).

[5] *Escambia County* v. *McMillan*, 466 U. S. 48, 51 (1984) *(per curiam);* see also *Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (Brandeis, J., concurring).

[6] S. Rep. No. 94–583, p. 65 (1975). The Court agrees regarding the first purpose, but inexplicably and without citation concludes that another purpose of § 314 is "to provide federal land managers with up-to-date information that allows them to make informed management decisions." *Ante,* at 87. This latter statutory "purpose" is not mentioned in the legislative history; rather, it is a variation of a "purpose," equally without citation, offered by appellants. See Brief for Appellants 45, 47.

[7] See n. 3, *supra*.

notice of intent to hold the claim and an affidavit of assessment work performed on the claim must be filed "on a detailed report provided by § 28-1 of Title 30." One must substitute the word "or" for the word "on" to make any sense at all out of this provision. This error should cause us to pause before concluding that Congress commanded blind allegiance to the remainder of the literal text of § 314.

Second, the express language of the statute is unambiguous in describing the place where the second annual filing shall be made. If the statute is read inflexibly, the owner must "file in the office of the Bureau" the required documents.[8] Yet the regulations that the Bureau itself has drafted, quite reasonably, construe the statute to allow filing in a mailbox, provided that the document is actually received by the Bureau prior to the close of business on January 19th of the year following the year in which the statute requires the filing to be made.[9] A notice mailed on December 30, 1982, and received by the Bureau on January 19, 1983, was filed "in the office of the Bureau" during 1982 within the meaning of the statute, but one that is hand-delivered to the office on December 31, 1982, cannot be accepted as a 1982 "filing."

The Court finds comfort in the fact that the implementing regulations have eliminated the risk of injustice. *Ante*, at 94. But if one must rely on those regulations, it should be apparent that the meaning of the statute itself is not all that obvi-

---

[8] See 43 U. S. C. § 1744(a)(2).

[9] Title 43 CFR § 3833.0-5(m) (1984) provides:

" 'Filed or file' means being received and date stamped by the proper BLM office. For the purpose of complying with § 3833.2-1 of this title, 'timely filed' means being filed within the time period prescribed by law, or received by January 19th after the period prescribed by law in an envelope bearing a clearly dated postmark affixed by the United States Postal Service within the period prescribed by law. This 20 day period does not apply to a notice of location filed pursuant to § 3833.1-2 of this title. (See § 1821.2-2(e) of this title where the last day falls on a date the office is closed.)"

ous.   To begin with, the regulations do not use the language "prior to December 31"; instead, they use "on or before December 30 of each year."[10]   The Bureau's drafting of the regulations using this latter phrase indicates that the meaning of the statute itself is not quite as "plain," *ante,* at 93, as the Court assumes; if the language were plain, it is doubtful that the Bureau would have found it necessary to change the language at all.   Moreover, the Bureau, under the aegis of the Department of the Interior, once issued a pamphlet entitled "Staking a Mining Claim on Federal Lands" that contained the following information:

> "Owners of claims or sites located on or before Oct. 21, 1976, have until Oct. 22, 1979, to file evidence of assessment work performed the preceding year or to file a notice of intent to hold the claim or site.   Once the claim or site is recorded with BLM, *these documents must be filed on or before December 31 of each subsequent year." Id.,* at 9–10 (1978) (emphasis added).

"Plain language," *ante,* at 93, indeed.

There is a more important reason why the implementing regulations cannot be supportive of the result the Court reaches today: the Bureau's own deviation from the statutory language in its mail-filing regulation.   See n. 9, *supra.*   If the Bureau had issued regulations expressly stating that a

---

[10] 43 CFR § 3833.2–1(b)(1) (1984).   It is undisputed that the regulations did not come to the attention of the appellees.   To justify the forfeiture in this case on the ground that appellees are chargeable with constructive notice of the contents of the Federal Register is no more acceptable to me today than it would have been to Justice Jackson in 1947.   "To my mind, it is an absurdity to hold that every farmer who insures his crops knows what the Federal Register contains or even knows that there is such a publication.   If he were to peruse this voluminous and dull publication as it is issued from time to time in order to make sure whether anything has been promulgated that affects his rights, he would never need crop insurance, for he would never get time to plant any crops." *Federal Crop Insurance Corporation* v. *Merrill,* 332 U. S. 380, 387 (1947) (Jackson, J., dissenting).

December 31 filing would be considered timely—just as it has stated that a mail filing received on January 19 is timely—it is inconceivable that anyone would question the validity of its regulation. It appears, however, that the Bureau has more power to interpret an awkwardly drafted statute in an enlightened manner consistent with Congress' intent than does this Court.[11]

In light of the foregoing, I cannot believe that Congress intended the words "prior to December 31 of each year" to be given the literal reading the Court adopts today. The statutory scheme requires periodic filings on a calendar-year basis. The end of the calendar year is, of course, correctly described either as "prior to the close of business on December 31," or "on or before December 31," but it is surely understandable that the author of § 314 might inadvertently use the words "prior to December 31" when he meant to refer to the end of the calendar year. As the facts of this case demonstrate, the scrivener's error is one that can be made in good faith. The risk of such an error is, of course, the greatest when the reference is to the end of the calendar year. That it was in fact an error seems rather clear to me because no one has suggested any rational basis for omitting just one day from the period in which an annual filing may be made, and I would not presume that Congress deliberately created a trap for the unwary by such an omission.

---

[11] The Court, *ante*, at 102–103, n. 14, criticizes my citation of the BLM regulations to demonstrate that the agency has itself departed from the "plain" statutory language by allowing mail filings to be received by January 19th. In the same breath, the Court acknowledges that the agency is not bound by the "plain" language in "administering the statute." *Ibid.* The mail-delivery deadline makes it clear that the Court's judicially created "up-to-date" statutory purpose is utterly lacking in foundation. The agency's adoption of the January 19 deadline illustrates that it does not need the information by December 30; that it is not bound by the language of the provision; and that substantial compliance does not interfere with the agency's statutory functions or with the intent of Congress.

It would be fully consistent with the intent of Congress to treat any filing received during the 1980 calendar year as a timely filing for that year. Such an interpretation certainly does not interfere with Congress' intent to establish a federal recording system designed to cope with the problem of stale mining claims on federal lands. The system is established, and apparently, functioning.[12] Moreover, the claims here were *active;* the Bureau was well aware that the appellees intended to hold and to operate their claims.

Additionally, a sensible construction of the statute does not interfere with Congress' intention to provide "an easy way of discovering which Federal lands are subject to either valid or

---

[12] Several *amici* have filed materials listing numerous cases in which it is asserted that the Bureau is using every technical construction of the statute to suck up active mining claims much as a vacuum cleaner, if not watched closely, will suck up jewelry or loose money. See Brief for Mountain States Legal Foundation as *Amicus Curiae* 2 (claiming that an "overwhelming number of mining claims have been lost to the pitfalls of section 314"), 3 (claiming that from 1977 to 1984 "unpatented mining claimants lost almost 20,000 active locations due to the technical rigors and conclusive presumption of section 314"); App. 1–86 (listing cases); Brief for Alaska Miners Association, California Mining Association, Nevada Mining Association, Miners Advocacy Council, and Placer Miners Association as *Amici Curiae*, Exhibit A (letter from Bureau's Utah State Office stating that well over 1,400 claims were invalidated from 1979–1983 because § 1744(a)(1) filings were made on December 31), Exhibit B (letter from Bureau's Billings, Montana Office stating that 198 claims were invalidated from 1979–1983 because § 1744(a)(1) filings were made on December 31), Exhibit C (letter from Bureau's Wyoming State Office stating that 11 claims were invalidated in 1980–1982 because § 1744(a)(2) filings were made on December 31), Exhibit D (letter from Bureau's Arizona State Office stating that "approximately 500 claims have been invalidated due to filing an affidavit one day late"); Brief for Mobil Oil Corporation as *Amicus Curiae* 2–4 (claiming to be in a situation similar to the appellees'). According to the Bureau's own calculations, thousands of active mining claims have been terminated because filings made on December 31 were considered untimely. These representations confirm the picture painted by *amici* of a federal bureaucracy virtually running amok, and surely operating contrary to the intent of Congress, by terminating the valuable property rights of hardworking, productive citizens of our country.

invalid mining claim locations."[13]   The Bureau in this case was well aware of the existence and production of appellees' mining claims; only by blinking reality could the Bureau reach the decision that it did.   It is undisputed that the appellees made the first 1980 filing on August 29, 1980, and made the second required filing on December 31, 1980; the Bureau did not declare the mining claims "abandoned and void" until April 4, 1981.   Thus, appellees lost their entire livelihood for no practical reason, contrary to the intent of Congress, and because of the hypertechnical construction of a poorly drafted statute, which an agency interprets to allow "filings" far beyond December 30 in some circumstances, but then interprets inflexibly in others.[14]   Appellants acknowledge that "[i]t may well be that Congress wished to require filing by the end of the calendar year and that the earlier deadline resulted from careless draftmanship."   Brief for Appellants 42, n. 31.   I have no doubt that Congress would have chosen to adopt a construction of the statute that filing take place by the end of the calendar year if its attention had been focused on this precise issue.   Cf. *DelCostello* v. *Teamsters*, 462 U. S. 151, 158 (1983).[15]

---

[13] S. Rep. No. 94–583, p. 65 (1975).

[14] The Court suggests that appellees' failure to file by December 30 "caused the property right to be extinguished."   *Ante*, at 107.   However, the Court, on the one hand, carefully avoids mentioning the 3-month period that elapsed after December 31 before the Bureau declared the appellees' mining claims abandoned, and, on the other hand, describes the Bureau as needing "up-to-date information that allows them to make informed land management decisions."   *Ante*, at 87, 107.

[15] The Court, *ante*, at 96–97, n. 12, lists several provisions in the United States Code as supportive of its position that "prior to December 31" is somehow less ambiguous because of its occasional use in various statutory provisions.   It then states that it "is unclear whether the arguments advanced by the dissenters are meant to apply to all of the provisions, or only to some of them."   *Ibid*.   However, the provisions cited for support illustrate the lack of justification for the Court's approach, and highlight the uniqueness of the provision in this case.   Eleven of the provisions refer to a one-time specific date; the provision at issue here requires specific action

## II

After concluding its constitutional analysis, the District Court also held that "the standard to be applied to assessment notice requirements is substantial compliance. Measured against this, the Lockes have satisfied their statutory duties under Section 1744 by filing their notices one day late."[16]  The District Court grounded its holding on this Court's analysis in *Hickel* v. *Oil Shale Corp.*, 400 U. S. 48 (1970).

In *Hickel*, the Court construed 30 U. S. C. §28, which reads:

"On each claim located after the 10th day of May 1872, and until a patent has been issued therefor, not less than $100 worth of labor shall be performed or improvements

on a continual annual basis, thus involving a much greater risk of creating a trap for the unwary.  Further, each of the specific dates mentioned in the 11 provisions is long past; thus, contrary to the Court's premise, this decision would have no effect on them because they require no future action. See 7 U. S. C. §609(b)(5) ("prior to December 31, 1937"); 12 U. S. C. §1709)(o)(1)(E) ("prior to December 31, 1976"); 12 U. S. C. §1823(g) ("prior to December 31, 1950"); 12 U. S. C. §1841(a)(5)(A) ("prior to December 31, 1970"); 26 U. S. C. §503(d)(1) ("prior to December 31, 1955"); 33 U. S. C. §1319(a)(5)(B) ("prior to December 31, 1974"); 42 U. S. C. §415(a)(7)(E)(ii) (1982 ed., Supp. III) ("prior to December 31, 1983"); 42 U. S. C. §1962d–17(b) ("prior to December 31, 1969"); 42 U. S. C. §5614 (b)(5) ("after the first year following October 3, 1977, prior to December 31"); 42 U. S. C. §7502(a)(2) ("prior to December 31, 1982"); 42 U. S. C. §7521(b)(2) ("prior to December 31, 1970"); 50 U. S. C. App. §1741(b)(1) ("prior to December 31, 1946").  The remaining provision cited as authority by the Court, 22 U. S. C. §3784(c), states that the Panama Canal and certain other property "shall not be transferred to the Republic of Panama prior to December 31, 1999."  The legislative history indicates that that language was added to make "clear that the President is not authorized to accelerate the final transfer of the Panama Canal in 1999, as provided by the Panama Canal Treaty of 1977."  H. R. Conf. Rep. No. 96–473, p. 61 (1979).  The Panama Canal Treaty of 1977, Art. II, indicates that it "shall terminate at noon, Panama time, December 31, 1999."  Therefore, the language of §3784(c) was tailored to a unique treaty provision.

[16] 573 F. Supp. 472, 479 (Nev. 1983).

made during each year. . . . *[U]pon a failure to comply with these conditions, the claim or mine upon which such failure occurred shall be open to relocation in the same manner as if no location of the same had ever been made,* provided that the original locators, their heirs, assigns, or legal representatives, have not resumed work upon the claim after failure and before such location." (Emphasis added.)

Recognizing that a claimant's "possessory title" should not be disturbed on "flimsy or insubstantial grounds," 400 U. S., at 57, the Court wrote:

"We agree . . . that every default in assessment work does not cause the claim to be lost. Defaults, however, might be the equivalent of abandonment; and we now hold that token assessment work, or assessment work that does not substantially satisfy the requirements of 30 U. S. C. § 28, is not adequate to 'maintain' the claims within the meaning of § 37 of the Leasing Act. To hold otherwise would help defeat the policy that made the United States, as the prospective recipient of royalties, a beneficiary of these oil shale claims. We cannot support [*Wilbur* v. *Krushnic*, 280 U. S. 306 (1930),] and [*Ickes* v. *Virginia-Colorado Development Corp.*, 295 U. S. 639 (1935)], on so broad a ground. Rather, their dicta to the contrary, we conclude that they must be confined to situations where there had been substantial compliance with the assessment work requirements. . . ." *Ibid.*

*Hickel* thus demonstrates that the District Court was correct that substantial-compliance analysis was appropriate in this case, and that appellees substantially complied with the statute. Appellees earned their livelihood since 1960 by mining the 10 unpatented mining claims now in dispute.[17] They paid income taxes, and property and production taxes to the State of Nevada, which appears as an *amicus* in sup-

---

[17] *Id.*, at 474.

port of appellees. The statute, passed in 1976, required appellees to register their mining claims "in the office where the location notice or certificate is recorded" and "in the office of the Bureau" by October 21, 1979; it is not disputed that appellees met the statute's two initial filing requirements.[18] Moreover, the statute required, within three years of October 21, 1976, that appellees file "in the office of the Bureau designated by the Secretary a copy of the official record of the notice of location or certificate of location."[19] Appellees also met this third requirement, thus completely informing the Bureau of the existence, the sizes, the locations, and the ownership of appellees' active mining claims. After the three initial filing requirements, the statute required that appellees make two separate annual filings: (1) an initial filing with the county recorder; and (2) a copy of the official record of the first filing filed with the Bureau. Appellees made the first of these filings for the 1980 calendar year on August 29, 1980. Because 1980 was generally the first year that claimants—including appellees—had to comply with the annual filing requirements that the new legislation mandated, the Bureau began the practice of mailing reminder notices about the filing due in the Bureau's office. Appellants acknowledge that appellees did not receive a reminder notice.[20] Nevertheless, appellees responsibly inquired about the date of filing with the Bureau for the 1980 calendar year; it is undisputed that Bureau personnel informed them that the filing was due "on or before December 31, 1980."[21] On December 31, 1980, appellees made a 700-mile round trip from Ely to Reno, Nevada, to hand-deliver their filings to the Bureau. The Bureau accepted the filings on that date.

In my view, this unique factual matrix unequivocally contradicts the statutory presumption of an intent to abandon by

---

[18] *Ibid.*

[19] 43 U. S. C. § 1744(b).

[20] Reply Brief for Appellants 13, n. 12.

[21] Affidavit of Laura C. Locke ¶ 3.

reason of a late filing. In sum, this case presents an ambiguous statute, which, if strictly construed, will destroy valuable rights of appellees, property owners who have complied with all local and federal statutory filing requirements apart from a 1-day "late" filing caused by the Bureau's own failure to mail a reminder notice necessary because of the statute's ambiguity and caused by the Bureau's information to appellees that the date on which the filing occurred would be acceptable. Further, long before the Bureau declared a technical "abandonment," it was in complete possession of all information necessary to assess the activity, locations, and ownership of appellees' mining claims and it possessed all information needed to carry out its statutory functions. Finally, the Bureau has not claimed that the filing is contrary to the congressional purposes behind the statute, that the filing affected the Bureau's land-use planning functions in any manner, or that it interfered "in any measurable way" with the Bureau's need to obtain information.[22] A showing of substantial compliance necessitates a significant burden of proof; appellees, whose active mining claims will be destroyed contrary to Congress' intent, have convinced me that they have substantially complied with the statute.

I respectfully dissent.

---

[22] Brief for Appellants 45.