MITNAUL, Appellant,

v.

FAIRMOUNT PRESBYTERIAN CHURCH et al., Appellees.

[Cite as *Mitnaul v. Fairmount Presbyterian Church,*
149 Ohio App.3d 769, 2002-Ohio-5833.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 80372.

Decided Oct. 24, 2002.

McIntyre, Kahn, Kruse & Gillombardo and Thomas M. Horwitz, for appellant. Davis & Young and Patrick F. Roche, for appellees.

Frank D. Celebrezze, Jr., Judge.

{¶ 1} The appellant, Bryan T. Mitnaul, appeals from the decision of the trial court, which granted the motion for summary judgment of the appellee, Fairmount Presbyterian Church, based on the absence of a genuine issue of material facts. For the reasons set forth below, we affirm in part and reverse in part the judgment of the trial court.

{¶ 2} The appellant, Bryan T. Mitnaul, was hired by the Fairmount Presbyterian Church (the "church") in July 1993 as its Interim Director of Music Ministries for a period of two years. In May 1994, based upon the recommendation of the church's Personnel Committee, Mitnaul was appointed Director of Music Ministries. The employment contract allowed for termination of the agreement by either party with 60 days' notice of intent.

{¶ 3} Prior to being hired by the church, Mitnaul had suffered from, and had received treatment for, depression since 1985. After being hired, Mitnaul advised a church administrator that he suffered from depression.

{¶ 4} On August 11, 1999, Mitnaul was admitted to the hospital for treatment of his depression. During the period of his hospitalization, the church placed him on a medical leave of absence, and an acting music director was appointed.

{¶ 5} Throughout Mitnaul's hospitalization, he remained in contact with several members of the church, including Reverend Miller. During one conversation Mitnaul had with Reverend Miller, he advised Reverend Miller that he would be able to return to work in January 2000; however, January 2000 came and went, and Mitnaul remained hospitalized for his depression. In March 2000, Mitnaul was transferred to Akron General Hospital following a suicide attempt. He again

informed the church that he would be able to return to work on April 1, 2000, but, again, he was unable to return to his job because of continued hospitalization.

{¶ 6}   During his extended medical leave, the church paid him his full salary for the first six weeks.  In addition, the church provided a voluntary payment to him to help supplement his disability benefits.

{¶ 7}   On April 5, 2000, Reverend Miller delivered to Mitnaul, who was still under treatment for his depression, a termination letter.  Mitnaul remained in the hospital until the next day, April 6, 2000, at which time he was cleared by his doctor, Dr. Jacob Gates, to return to work.  On April 7, 2000, Dr. Abdon cleared Mitnaul to return to work.  On April 8, 2000, psychologist Paul Becker cleared Mitnaul to return to work.

{¶ 8}   In addition, on April 7, 2000, the "Fairmount Presbyterian Church Fairmount Flyer," the church's newsletter, posted an article on their website, stating:

{¶ 9}   "We have good news for you!  Bryan Mitnaul is returning to Fairmount after a long medical leave of absence.  Since the summer of last year, Bryan has been treated for bi-polar illness, a condition which at times has resulted in serious depression for him.  Various therapies and medications have been tried, and finally, after much experimentation, his health has improved considerably.  For that we are all very happy."

{¶ 10}   After Mitnaul's discharge from the hospital, he was visited at his home by Lee Chilcote, who is an attorney and also serves as the clerk of the church.  During this visit, Chilcote delivered a severance agreement to Mitnaul, which he advised was to replace the termination letter of April 5, 2000.  The severance agreement terminated Mitnaul's relationship with the church and provided six months' severance pay and insurance coverage for an additional year.  Chilcote further informed Mitnaul that he should consult an attorney before signing the severance agreement.

{¶ 11}   On April 10, 2000, counsel for the church prepared and delivered a letter to Mitnaul's attorney finding Mitnaul's failure to approve the severance agreement as a rejection of the offer and, therefore, welcoming Mitnaul to return to his full-time position as the Director of Music Ministries at the church.

{¶ 12}   On May 12, 2000, a meeting was held between the parties involved.  At this meeting, Mitnaul requested that certain accommodations be made before he would return to his position at the church.  The requested conditions included:

{¶ 13}   "(1) That Mr. Mitnaul receive a letter from the personnel committee describing the circumstances that preceded Jon Miller's letter;

{¶ 14}  "(2) That there be some official communication to the congregation that Mr. Mitnaul will return to work, that his leave of absence was not due to performance, but rather was caused by a medical condition;

{¶ 15}  "(3) That John Miller be relieved of his duties as interim pastor, or, in the alternative, that Mr. Miller's contact with Mr. Mitnaul be limited or restricted; and,

{¶ 16}  "(4) that Mr. Mitnaul receive a lump sum payment of up to two years salary."

{¶ 17}  On May 18, 2000, the attorney for the church wrote to Mitnaul's attorney rejecting Mitnaul's counteroffer regarding his return to work.  The letter stated that "the conditions Mr. Mitnaul has placed on his return to work are unacceptable, especially his effort to dramatically change his employment environment and his request for financial compensation.  The church is still hopeful that Mr. Mitnaul will return to his full duties as the Director of Ministries.  To that end, the church reiterates its unconditional offer to Mr. Mitnaul to return to work."

{¶ 18}  Mitnaul rejected the church's unconditional offer to return to work without the requested accommodations.  He contends that he had learned there were vicious rumors being circulated around the church that he was a pedophile.  Therefore, he was concerned that if he returned to the church, his work would be unreasonably scrutinized and he would then be fired for his inability to perform all of the job functions.

{¶ 19}  Based on this rejection of their offer, the church sent a letter to Mitnaul's attorney, which stated:

{¶ 20}  "I have received your correspondence dated May 18, 2000 indicating that Mr. Mitnaul has terminated his employment with the Fairmount Presbyterian Church.  Mr. Mitnaul's personnel records will reflect that he voluntarily resigned as of May 18, 2000."

{¶ 21}  Later, on February 8, 2001, after seeing an advertisement posted on the church's internet website, Mitnaul applied to the church for the advertised position of Director of Music Ministries.  He claims that the church's personnel committee made a decision to prevent him from being considered for the posted position.

{¶ 22}  On February 22, 2001, Mitnaul filed a charge with the EEOC and OCRC claiming that the church had retaliated against him for engaging in protected conduct.  On July 31, 2001, the EEOC issued a determination that the church had violated the Americans with Disabilities Act of 1990, as amended.  On August 6, 2001, the EEOC chose not to review the charge of retaliation because it was the same conduct from which the present action arose.

{¶ 23}  On October 20, 2000, the appellant filed the present action in the Cuyahoga County Court of Common Pleas against the Fairmount Presbyterian Church and Reverend John Miller.  On September 7, 2001, the church and Miller filed separate motions for summary judgment.  On October 5, 2001, Mitnaul filed his brief in opposition to the appellees' motions for summary judgment.  On October 9, 2001, Mitnaul voluntarily dismissed Miller from the action.

{¶ 24}  On October 10, 2001, the trial court entered summary judgment in favor of the church.  Mitnaul now appeals and asserts the following assignments of error:

{¶ 25}  "I. The trial court erred when it granted defendant church's motion for summary judgment."

{¶ 26}  The appellant contends that the trial court erred in granting the appellee's motion for summary judgment because a reasonable person could conclude that the church committed several employment-related torts toward the appellant.  The appellant's contentions are without merit.

{¶ 27}  The standard of review for an appellate court on a lower court's granting of summary judgment is de novo.  *"De novo* review means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial."  *Brewer v. Cleveland City Schools* (1997), 122 Ohio App.3d 378, 701 N.E.2d 1023, citing *Dupler v. Mansfield Journal* (1980), 64 Ohio St.2d 116, 119–120, 18 O.O.3d 354, 413 N.E.2d 1187.

{¶ 28}  Summary judgment is appropriate where it appears that (1) there is no genuine issue as to any material fact;  (2) the moving party is entitled to judgment as a matter of law;  and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor.  *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 375 N.E.2d 46;  Civ.R. 56(C).

{¶ 29}  The movant possesses the burden of establishing that no genuine issue of material fact exists.  This burden must be satisfied by specifically producing evidence contained within the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations, which demonstrate the nonmoving party's lack of support toward his claims.  *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264.

### A. Discrimination Based Upon Disability

{¶ 30}  R.C. 4112.02 prohibits handicap discrimination in employment. In order to establish a prima facie case of handicap discrimination under R.C. 4112.02, a plaintiff must demonstrate:

{¶ 31}  "(1) [T]hat he or she was handicapped,

{¶ 32}  "(2) [T]hat an adverse employment action was taken by an employer, at least in part, because the individual was handicapped, and

{¶ 33}  "(3) [T]hat the person, though handicapped, can safely and substantially perform the essential functions of the job [with or without a reasonable accommodation]."  *Columbus Civ. Serv. Comm. v. McGlone* (1998), 82 Ohio St.3d 569, 571, 697 N.E.2d 204.

{¶ 34}  Once a plaintiff has satisfied the elements under R.C. Chapter 4112, the burden then shifts to the employer to establish a nondiscriminatory basis for its actions.  * * * Legitimate, nondiscriminatory reasons for the action taken by the employer may include the inability of the employee or prospective employee to safely and substantially perform, with reasonable accommodation, the essential function of the job in question.  *Hood v. Diamond Prods., Inc.* (1996), 74 Ohio St.3d 298, 302, 658 N.E.2d 738.

{¶ 35}  The first element of the prima facie case requires that the individual be handicapped.  " 'Handicap' means a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working;  a record of a physical or mental impairment;  or being regarded as having a physical or mental impairment." R.C. 4112.01(A)(13).

{¶ 36}  Several Ohio courts have found depression to qualify as a "handicap" under R.C. 4112.02, depending on the circumstances of the case.  *Shaver v. Wolske & Blue* (2000), 138 Ohio App.3d 653, 742 N.E.2d 164; *Beauchamp v. CompuServe, Inc.* (1998), 126 Ohio App.3d 17, 709 N.E.2d 863; *Hayes v. Cleveland Pneumatic Co.* (1993), 92 Ohio App.3d 36, 634 N.E.2d 228.  "The mere fact that the appellant suffered from depression is not sufficient, in and of itself, to meet the definition of a handicap under R.C. 4112.01.  In order to be handicapped, under the Revised Code, the mental impairment must substantially limit one or more major life activities."  *Beauchamp,* 126 Ohio App.3d at 23, 709 N.E.2d 863.

{¶ 37}  In the case sub judice, attached to the appellant's brief in opposition to defendant's motion for summary judgment is a correspondence from Paul Becker, Ph.D., Clinical Psychologist, to the appellee's attorney regarding Mitnaul.  In the

correspondence, Dr. Becker states that the appellant has been previously diagnosed with a major depressive disorder as well as the additional diagnosis of post-traumatic stress disorder after being attacked by another patient while Mitnaul was hospitalized.

{¶ 38} This court must find that there is a genuine issue of material fact as to whether Mitnaul was handicapped and whether his depression substantially limited any of his major life activities. As noted by the court in *Taylor v. Phoenixville School Dist.* (C.A.3, 1999), 184 F.3d 296, 309, an individual does not have to experience problems every day to be substantially limited because chronic, episodic conditions have a cumulative effect on an individual's ability to perform life functions when compared to the average person in the general population.

{¶ 39} To satisfy the second element of the prima facie case, the appellant must demonstrate that the church took an adverse employment action based on his condition. The letter of termination delivered by Reverend Miller to Mitnaul while he was in the hospital, attached to appellee's motion for summary judgment, states:

{¶ 40} "After many thoughts had been expressed, the committee unanimously came to the decision—albeit with much heaviness of heart for you, for themselves, for the choirs, and for the whole congregation—that you are not physically or mentally able at this time to continue in the position in which you have so distinguished yourself. We believe it would be unfair to you as well as to the congregation to attempt something we feel your current health situation renders you incapable of doing."

{¶ 41} The statements found in the letter satisfy the second element of the prima facie case.

{¶ 42} As to the third element, the church claims that Mitnaul is not a qualified handicapped person because he cannot perform the essential functions of the job with or without reasonable accommodation.

{¶ 43} "The administrative code uses the term 'qualified disabled person' to define 'a disabled person who can safely and substantially perform the essential functions of the job in question, with or without reasonable accommodation.'" *Smith v. Dillard Dept. Stores, Inc.* (2000), 139 Ohio App.3d 525, 531–532, 744 N.E.2d 1198, citing Ohio Adm.Code 4112–5–02(K).

{¶ 44} In the instant case, the appellant requested several accommodations before he could return to his job. "An employer must make reasonable accommodation to the disability of an employee or applicant, unless the employer can demonstrate that such an accommodation would impose an undue hardship on

the conduct of the employer's business.'" Ohio Adm.Code 4112–5–08. In this regard, the employer has the burden to show that an accommodation would impose an undue hardship. In addition, once an employee has made a requested accommodation, an employer is obligated to participate in the interactive process of seeking an accommodation by making a good-faith effort to work with the employee to seek an accommodation. *Taylor*, 184 F.3d at 317.

{¶ 45} However, as this court has already concluded in *Dillard*, "the 'reasonableness' of an accommodation ordinarily presents a question of fact for the jury to decide." Id. at 534, 744 N.E.2d 1198. Therefore, whether all or some of the accommodations presented by the appellant were reasonable, and whether the appellee made a good-faith effort to work with the appellant to seek a reasonable accommodation, are matters left to the jury and not those to be determined by the court.

{¶ 46} The trial court, therefore, erred in finding that no genuine issue of material fact existed regarding the appellant's claim made under R.C. Chapter 4112.

## B. Retaliatory Discharge

{¶ 47} The appellant next contends that the church discharged him after it determined that he had contacted an attorney regarding the problems he was having with the church's returning him to his position. The appellant further contends that the additional protected activities of requesting accommodations by the church and filing a claim with the OCRC further led to his discharge.

{¶ 48} "To establish a prima facie case of retaliatory discharge, a plaintiff must produce evidence that: (1) she engaged in protected activity; (2) her protected activities were known to defendant; (3) defendant took adverse employment action against her and stated reasons that were not the true retaliatory reason; and (4) there is a causal connection between the protected activity and the adverse employment action." *Mack v. B.F. Goodrich Co.* (1997), 121 Ohio App.3d 99, 104, 699 N.E.2d 97, citing *Rudy v. Loral Defense Sys.* (1993), 85 Ohio App.3d 148, 619 N.E.2d 449. Once the complainant presents evidence of a prima facie case of discrimination, the burden then shifts to the respondent to articulate some legitimate nondiscriminatory reason for the action.

{¶ 49} The appellant first claims that when the church discovered he had engaged an attorney, it refused to consider his disability accommodations and informed the general public that he had resigned. However, the record demonstrates that when Chilcote visited Mitnaul at his home, he handed Mitnaul a proposed agreement with a severance package and advised him to hire an

attorney to review the document. The appellant cannot now claim that his employer, who told him to seek out an attorney, then fired him because he did so.

{¶ 50} In addition, the appellant claims that the church fired him after finding that he had filed an action with the OCRC. However, the filing of the action with the OCRC occurred after the appellant had been fired from the church. Therefore, the appellant's claim of a protected activity was not known by the church at the time that he was fired.

{¶ 51} The appellant has failed to establish the necessary elements to assert a claim of retaliatory discharge. The trial court correctly found the absence of a genuine issue of material fact and granted appellee's motion for summary judgment on this claim.

### C. Invasion of Privacy

{¶ 52} This court, in *Rogers v. Buckel* (1992), 83 Ohio App.3d 653, 658, 615 N.E.2d 669, citing *Housh v. Peth* (1956), 165 Ohio St. 35, 59 O.O. 60, 133 N.E.2d 340, set out the elements required for an action of invasion of privacy:

{¶ 53} "The right of privacy is the right of a person to be let alone, to be free from unwarranted publicity, and to live without unwarranted interference by the public in matters with which the public is not necessarily concerned." Id. at paragraph one of the syllabus.

{¶ 54} "An actionable invasion of the right to privacy is the unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." Id. at paragraph two of the syllabus.

{¶ 55} The plaintiff must be able to demonstrate that the area intruded into was private and that the intrusion itself was unwarranted and offensive or objectionable to a reasonable person. *Krause v. Case W. Res. Univ.* (Dec. 19, 1996), Cuyahoga App. No. 70712, 1996 WL 732537, citing *Contadino v. Tilow* (1990), 68 Ohio App.3d 463, 470, 589 N.E.2d 48.

{¶ 56} The appellant's argument centers around the statement made by the church on its own website, which read:

{¶ 57} "We have good news for you! Bryan Mitnaul is returning to Fairmount after a long medical leave of absence. Since the summer of last year, Bryan has been treated for bi-polar illness, a condition which at times has resulted in serious depression for him. Various therapies and medications have

been tried, and finally, after much experimentation, his health has improved considerably. For that we are all very happy."

{¶ 58} In the case sub judice, the comments made on the church's website were based purely on the appellant's private affairs, i.e., his hospitalization for depression. While the appellant did inform those necessary persons about his condition—Reverend Miller and a few close friends who belonged to the church—this cannot be seen as a waiver to enter his private life.

{¶ 59} This case is distinguishable from *Bertsch v. Communications Workers of Am.* (1995), 101 Ohio App.3d 186, 655 N.E.2d 243, where the court determined that the information distributed about the plaintiff was of a legitimate concern to the members of the union and that the statements made to the union were done so in the broad context of a labor dispute.

{¶ 60} In the instant case, while the church's publication could be based upon informing the congregation of Mitnaul's return to the church, the inclusion of the additional personal information about his bi-polar illness could be viewed as offensive or objectionable to a reasonable person. Therefore, there is a genuine issue of fact as to the nature of the church's disclosure, and the trial court erred by granting summary judgment based on this claim.

### D. Intentional Infliction of Emotional Distress

{¶ 61} As stated by this court in *Pfleger v. BP Am., Inc.* (June 27, 1996) Cuyahoga App. No. 68874, 1996 WL 355290, " 'the test to recover for intentional infliction of emotional distress is set forth in *Hanly* [*v. Riverside Methodist Hosp.* (1991), 78 Ohio App.3d 73], at 82 [603 N.E.2d 1126], citing *Pyle v. Pyle* (1983), 11 Ohio App.3d 31, at 34 [463 N.E.2d 98]:

{¶ 62} " 'A claim for intentional infliction of emotional distress required plaintiff to show that (1) defendant intended to cause emotional distress, or knew or should have known that actions taken would result in serious emotional distress; (2) defendant's conduct was extreme and outrageous; (3) defendant's action proximately caused plaintiff's psychic injury; and (4) the mental anguish plaintiff suffered was serious.' "

{¶ 63} "[A]n action to recover for emotional distress may not be premised upon mere embarrassment or hurt feelings, but must be predicated upon a psychic injury that is both severe and debilitating." *Uebelacker v. Cincom Sys., Inc.* (1988), 48 Ohio App.3d 268, 276, 549 N.E.2d 1210.

{¶ 64} In the instant case, the appellant submitted a letter from his clinical psychologist, which stated:

{¶ 65} "The placement and publication of Mr. Mitnaul's diagnosis and treatment on an unrestricted website without his consent was unbelievable and

outrageous. It is my professional opinion that this publication of Mr. Mitnaul's personal, intimate and confidential information had a negative impact on his emotional progress and further increased his feelings of betrayal and disillusionment."

{¶ 66} The statements made by the appellant's doctor are sufficient to establish the second, third, and fourth prima facie elements for intentional infliction of emotional distress; however, the appellant has failed to establish that the actions of the church were done in an "intentional manner or in a manner which one would know or should know would result in harm."

{¶ 67} Therefore, the trial court did not err in granting the appellee's motion for summary judgment as to the appellant's claim for intentional infliction of emotional distress.

### E. Breach of Contract

{¶ 68} The evidence presented established that the appellant was discharged from his full-time position with the church as Director of Music Ministries. There does, however, exist a genuine issue of material fact as to whether the termination occurred within the required 60–day notice, pursuant to the employment contract. Therefore, the trial court erred in granting summary judgment in respect to the appellant's claim of breach of contract.

> Judgment affirmed in part,
> reversed in part
> and cause remanded.

PATRICIA A. BLACKMON, P.J., and ANNE DYKE, J., concur.