OPINION
{¶ 1} Plaintiff-appellant, Mary Carolyn Porter, appeals from a judgment of the Franklin County Court of Common Pleas that (1) granted summary judgment in favor of defendant-appellee, Heather Reed, and (2) dismissed Porter's motion for partial summary judgment against defendants-appellees, Aaron M. Saez and Heather Reed, pertaining to Porter's claims of fraudulent transfer and civil conspiracy. For the following reasons, we affirm.
 {¶ 2} According to Porter, on or about June 2, 1999, Aaron Saez dba 3R Contracting Services, presented Porter with a proposal concerning the construction of a garage on Porter's property. According to the proposal, the cost for the project was $13,800 with payment to be made in three installments of $4,600. Prior to accepting the proposal, Porter purportedly asked Saez if he was a licensed contractor and if he was bonded. Saez purportedly assured Porter that he was a licensed contractor. Upon Porter's acceptance of the proposal, Saez allegedly informed Porter that construction would begin the week of June 7, 1999. However, according to Porter, construction of the project actually began the first week of July 1999, not the week of June 7, 1999, as Saez earlier had represented.
 {¶ 3} According to Porter, Saez asked for a $1,000 advance to cover initial material costs and the cost of a construction permit. Porter paid the requested advance to Saez. On June 28, 1999, Porter also paid $3,600 to Saez and, on July 3, 1999, Porter paid $4,600 to Saez.
 {¶ 4} According to Porter, in early July 1999, Saez installed footers and framed the garage; however, little work was completed during the remainder of July 1999. During the weekend of July 31, 1999, Porter purportedly discovered that the actual size of the garage was smaller than what was provided for in the garage specifications.
 {¶ 5} On or about August 1, 1999, Saez allegedly assured Porter that construction would be completed within approximately ten days. During the week of August 2, 1999, siding and roofing were installed. However, according to Porter, as of August 12, 1999, no electrical work had been completed, no concrete floor or apron had been installed, and the main door and back door had not been installed.
 {¶ 6} During the following weeks, Porter purportedly attempted several times to contact Saez. On August 25, 1999, Saez allegedly contacted Porter and informed her that he needed $2,000 to finish the construction project. According to Porter, Saez also informed her that if she did not pay the requested $2,000, she would be in breach of contract.
 {¶ 7} Rather than pay $2,000 directly to Saez, Porter purportedly offered to directly pay Saez's subcontractors and requested an itemization of how the $2,000 should be allocated. Saez allegedly never responded to the offer.
 {¶ 8} In a letter dated September 7, 1999, that was sent to Saez via certified mail, Porter outlined aspects of the project that were nonconforming with the project's specifications and informed Saez that their contract was terminated. Saez allegedly refused to accept service of the letter.
 {¶ 9} Subsequently, Porter retained the services of other contractors to complete the construction of the garage at additional cost to her. After Porter retained the services of other contractors, she discovered that the location of the garage's foundation, which purportedly had been installed by Saez, violated a city ordinance due to its proximity to the property line. Porter retained an attorney to assist with a petition for a variance.
 {¶ 10} The variance was later granted. However, as a condition of granting the variance, Porter was required to record a maintenance easement with a neighbor. As a consequence of her efforts to secure a variance, Porter incurred $1,363 in costs and fees.
 {¶ 11} For his part, Saez, who is self-employed as a landlord and handyman, admits that he agreed to build the garage for Porter. According to Saez, Porter, who was a social acquaintance of Saez, approached him at a coffee shop and asked if he would build a garage for her. Prior to contracting with Porter, Saez allegedly had never constructed a garage nor had Saez allegedly advertised that he built garages. Saez denies he has a construction business of any kind and he admits that he does not have a professional builder's license.
 {¶ 12} According to Saez, at the time he agreed to build the garage, he believed he could construct the garage with the assistance of Edward Elford,[1] a general contractor, who purportedly had represented to Saez that he had the necessary license and experience to construct a garage.
 {¶ 13} Saez claims Elford agreed to apply for the permit and, accordingly, Saez gave Elford money to apply for the permit and to purchase building supplies. Later, however, Saez learned that Elford only possessed a general contractor's license and lacked a home improvement contractor's license. Moreover, according to Saez, Elford began the construction project without the required permit.[2]
 {¶ 14} According to Saez, Elford drew the plans for the garage, dug the footer, measured the lot, measured the placement of the footers, hired masons, built the walls, and built half of the roof tresses.
 {¶ 15} At some point, Elford left the project and failed to respond to Saez's request to return to the construction site. Saez concedes that certain work was not completed, such as hanging the back door and pouring the concrete floor. However, contrary to Porter's claim, Saez asserts Porter and he never agreed to equip the garage with electricity.
 {¶ 16} On June 28, 2001, Porter filed a complaint in the Franklin County Court of Common Pleas against Saez wherein Porter alleged: (1) Saez breached the contract with Porter; (2) Saez intentionally misrepresented himself to be a licensed contractor and intentionally misrepresented that he would obtain a building permit; (3) Saez violated R.C. Chapter 1345, the Ohio Consumer Sales Practices Act; and (4) Saez acted in bad faith.[3]
 {¶ 17} During the course of litigation, several discovery problems arose, some of which resulted in sanctions against Saez, Saez's girlfriend, Heather Reed, with whom Saez resides, and another person and entity.
 {¶ 18} On September 4, 2001, Porter moved for a default judgment as to liability and for a hearing to consider the issue of damages. On September 19, 2001, the trial court rendered a default judgment in Porter's favor as to liability and ordered a hearing to consider the issue of damages.
 {¶ 19} On December 11, 2001, the trial court, through a magistrate, conducted a hearing to determine damages. That same day, claiming excusable neglect, Saez moved for relief from judgment and for a stay of the proceedings.
 {¶ 20} On December 17, 2001, the trial court, through a magistrate, concluded that both treble damages and attorney fees were warranted based upon Saez's conduct. However, the magistrate did not make a determination concerning the amount of attorney fees and recommended another hearing to consider that issue. Saez did not object to the magistrate's decision.
 {¶ 21} On January 16, 2002, based upon the magistrate's decision of December 17, 2001, and Saez's failure to object to the magistrate's decision, the trial court granted judgment in favor of Porter. The trial court also ordered a hearing to determine attorney fees.
 {¶ 22} On February 19, 2002, the trial court garnished Saez's bank accounts and ordered the bank to furnish information concerning Saez's accounts. Saez disputed the claim for attachment of his property and requested a hearing. On March 13, 2002, after earlier conducting a hearing to consider Saez's objection to the bank garnishment, the trial court, through a magistrate, overruled Saez's objection to the bank garnishment.
 {¶ 23} On March 14, 2002, the trial court ordered the clerk of courts to disburse to Porter's attorney all monies in the clerk of courts' possession that were held under the bank garnishment order. The trial court ordered payment to be applied first to costs, and the balance to be applied to the judgment.
 {¶ 24} Subsequently, however, on March 25, 2002, the trial court granted Saez's motion of December 11, 2001, for relief from judgment, and the trial court vacated its default judgment of September 19, 2001.
 {¶ 25} On April 1, 2002, Porter moved the trial court to reconsider its judgment of March 25, 2002. The trial court denied Porter's motion for reconsideration and also vacated its judgment of January 16, 2002.
 {¶ 26} On April 25, 2002, Porter moved for leave to file a motion for partial summary judgment. The trial court granted this motion.
 {¶ 27} On June 18, 2002, Porter amended the complaint to include Heather Reed as a new-party defendant. In this amended complaint, Porter alleged: (1) Saez breached the contract with Porter; (2) Saez intentionally misrepresented that he was a licensed contractor and intentionally misrepresented that he would obtain a building permit; (3) Saez violated R.C. Chapter 1345, the Ohio Consumer Sales Practices Act; (4) Saez acted in bad faith; (5) Saez engaged in a fraudulent conveyance with Reed, wherein Saez transferred property or other assets to Reed for the purpose of insulating Saez from judgment; and (6) Saez and Reed engaged in a civil conspiracy wherein Saez and Reed conspired to fraudulently transfer Saez's assets.
 {¶ 28} On July 8, 2002, Porter moved for a default judgment on the amended complaint against Saez. The trial court denied this motion.
 {¶ 29} On July 9, 2002, Saez and Reed answered Porter's amended complaint, and Saez filed a third-party complaint against Edward Elford, Saez's subcontractor for the construction project. In the third-party complaint, Saez alleged: (1) Elford breached his agreement with Saez; and (2) Elford fraudulently misrepresented himself.
 {¶ 30} On November 7, 2002, the trial court garnished Heather Reed's bank accounts and ordered the bank to furnish information concerning Reed's accounts. Reed disputed the claim for attachment of her property and requested a hearing. On November 21, 2002, a hearing was scheduled to consider Reed's objection to the bank garnishment.
 {¶ 31} On February 12, 2003, Porter moved for partial summary judgment against Saez pertaining to Porter's claims of (1) breach of contract, and (2) a violation of R.C. Chapter 1345, the Ohio Consumer Sales Practices Act.
 {¶ 32} On March 28, 2003, Heather Reed moved for summary judgment as to all claims that were brought against her. After having been granted leave to file a cross-motion for partial summary judgment, on April 25, 2003, Porter moved for partial summary judgment against Saez and Reed pertaining to the fraudulent conveyance and conspiracy claims in Porter's amended complaint.
 {¶ 33} On September 25, 2003, for the reasons set forth in a decision of May 15, 2003, the trial court rendered partial summary judgment in favor of Porter pertaining to Porter's claims of breach of contract and a violation of R.C. Chapter 1345. In its judgment entry of September 25, 2003, the trial court found Saez met the definitional requirement of a "supplier" as set forth in R.C. 1345.01(C). The trial court ordered damages to be determined at trial with prejudgment interest to accrue from September 7, 1999.
 {¶ 34} On September 30, 2003, for the reasons set forth in a decision of September 2, 2003, the trial court granted Reed's motion for summary judgment as to all claims against her and dismissed Porter's partial summary judgment motion of April 25, 2003, pertaining to allegations of fraudulent conveyance and civil conspiracy against Saez and Reed. In its judgment entry of September 30, 2003, the trial court found no just cause for delay and stated its judgment was a final appealable order.
 {¶ 35} Porter timely appeals from the trial court's judgment of September 30, 2003,[4] and assigns the following errors:
ASSIGNMENT OF ERROR NO. 1:
The trial court erred in denying ms. porter partial summary Judgment on the fifth cause of action, as no genuine issues of material fact exist as to whether Mr. Saez engaged in a fraudulent transfer.
ASSIGNMENT OF ERROR NO. 2:
The trial court erred in holding that ms. reed cannot be considered An "Insider" for the purposes of R.C. 1336.01(B) [sic].
ASSIGNMENT OF ERROR NO. 3:
The trial court erred in granting summary judgment for Ms. reed on the sixth cause of action as genuine issues of material fact exist as to whether Ms. Reed engaged in a conspiracy.
 {¶ 36} Appellate review of a lower court's granting of summary judgment is de novo. Mitnaul v. Fairmount PresbyterianChurch, 149 Ohio App.3d 769, 2002-Ohio-5833, at ¶ 27. "`Denovo review means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial.'" Id., quoting Brewer v. Cleveland City Schools Bd. ofEdn. (1997), 122 Ohio App.3d 378, citing Dupler v. MansfieldJournal Co., Inc. (1980), 64 Ohio St.2d 116, 119-120, certiorari denied (1981), 452 U.S. 962, 101 S.Ct. 3111. Summary judgment is proper when a movant for summary judgment demonstrates: (1) no genuine issue of material fact exists; (2) the movant is entitled to judgment as a matter of law; and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most strongly construed in its favor. Civ.R. 56; State ex rel. Grady v. State Emp.Relations Bd. (1997), 78 Ohio St.3d 181, 183.
 {¶ 37} Under Civ.R. 56(C), a movant bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record demonstrating the absence of a material fact. Dresher v. Burt (1996),75 Ohio St.3d 280, 293. Once a movant discharges its initial burden, summary judgment is appropriate if the nonmoving party does not respond, by affidavit or as otherwise provided in Civ.R. 56, with specific facts showing that a genuine issue exists for trial.Dresher, at 293; Vahila v. Hall (1997), 77 Ohio St.3d 421,430; Civ.R. 56(E).
 {¶ 38} Porter's first assignment of error asserts the trial court erred in denying Porter's fraudulent transfer claim as no genuine issues of material fact exist as to whether Saez engaged in a fraudulent transfer. At issue is Saez's sale to Reed of real property at 2372 Indianola Avenue in Columbus, Ohio (the "Indianola property") on April 18, 2002, and Reed's purchase of real property at 3270 Kioka Avenue in Upper Arlington, Ohio (the "Kioka property") on April 24, 2002.
 {¶ 39} According to Porter, to satisfy the then-existing default judgment of January 16, 2002, in favor of Porter, Saez represented to a title company that the Indianola property had been sold to Reed under a land installment contract, which Reed was to refinance with a mortgage loan. However, Saez allegedly continued to exercise control over the Indianola property after it was transferred to Reed. To qualify for the mortgage loan, Reed allegedly then made misrepresentations to the mortgage lender.
 {¶ 40} Prior to the closing of the sale of the Indianola property, however, the trial court vacated its judgment of January 16, 2002. Therefore, because the judgment against Saez had been vacated, the amount that was previously set aside to satisfy the default judgment in favor of Porter was paid to Saez after the closing of the Indianola property.
 {¶ 41} According to Porter, to protect his assets from the sale of the Indianola property, Saez devised a scheme wherein he would covertly invest in the Kioka property, which was bought by Reed and titled solely in Reed's name. According to Porter, Reed could not afford the Kioka property only based upon her income and, therefore, Saez was required to invest $9,482.70 of his own money at closing and pay one-half of the monthly mortgage payments.
 {¶ 42} For his part, Saez argued before the trial court that he had adequate resources to satisfy any potential judgment and, therefore, the fraudulent transfer claim was without merit. (April 7, 2003, Affidavit of Saez, at paragraph 3.) However, Saez did not support his assertion of adequate resources with supporting documentation. Furthermore, according to Saez, he did not transfer or sell the Indianola property with an intent to hinder, delay, or defraud Porter. Rather, according to Saez, the transaction occurred within his ordinary course of business. (Id. at paragraph 4.)
 {¶ 43} Saez's averments in his affidavit of April 7, 2003, are not persuasive. See Bell v. Beightler, Franklin App. No. 02AP-569, 2003-Ohio-88, appeal not allowed, 99 Ohio St.3d 1410, at ¶ 33 ("[g]enerally, a party's unsupported and self-serving assertions, offered by way of affidavit, standing alone and without corroborating materials under Civ.R. 56, will not be sufficient to demonstrate material issues of fact. Otherwise, a party could avoid summary judgment under all circumstances solely by simply submitting such a self-serving affidavit containing nothing more than bare contradictions of the evidence offered by the moving party").
 {¶ 44} In 1990, the General Assembly adopted the Uniform Fraudulent Transfer Act ("UFTA"), which replaced the Uniform Fraudulent Conveyance Act. Aristocrat Lakewood Nursing Home v.Mayne (1999), 133 Ohio App.3d 651, 660-661, citing Profeta v.Lombardo (1991), 75 Ohio App.3d 621, 624; Sub.H.B. No. 506, 143 Ohio Laws, Part III, 5403. Ohio's version of the UFTA is codified in R.C. Chapter 1336. See, generally, R.C. 1336.01, et seq.
 {¶ 45} R.C. 1336.04(A) provides:
A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:
(1) With actual intent to hinder, delay, or defraud any creditor of the debtor;
(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:
(a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;
(b) The debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.
 {¶ 46} As stated in Huntington Natl. Bank v. Ginn (Dec. 26, 1996), Cuyahoga App. No. 70392:
* * * The ultimate burden of proof rests upon the party seeking to set aside the alleged fraudulent conveyance. In determining actual intent, R.C. 1336.04(B) lists several statutory factors, termed "badges of fraud," that a court considers in determining whether an inference of fraud exists. If the party alleging fraud is able to demonstrate a sufficient number of badges, the burden of proof then shifts to the defendant to prove that the transfer was not fraudulent * * *.
Id. (Footnotes omitted.) See, also, Baker Sons Equip. Co. v.GSO Equip. Leasing, Inc. (May 11, 1993), Franklin App. No. 92AP-1380, citing Cardiovascular Thoracic Surgery of Canton,Inc. v. DiMazzio (1987), 37 Ohio App.3d 162, 166 ("[i]f the party alleging fraud is able to demonstrate a sufficient number of badges, the burden of proof then shifts to defendant to prove that the transfer was not fraudulent").
 {¶ 47} "It is rudimentary that the issue concerning fraudulent intent is to be determined in view of the facts and circumstances of each case. * * * Due to the difficulty in finding direct proof of fraud, courts of this state began long ago to look to inferences from the circumstances surrounding the transaction and the relationship of the parties involved." Steinv. Brown (1985), 18 Ohio St.3d 305, 308-309 (construing former R.C. Chapter 1336).
 {¶ 48} Here, as the party seeking to set aside the alleged fraudulent conveyance, Porter has the burden of proof to establish Saez entered into a fraudulent conveyance with Reed.
 {¶ 49} R.C. 1336.04(B) provides:
In determining actual intent under division (A)(1) of this section, consideration may be given to all relevant factors, including, but not limited to, the following:
(1) Whether the transfer or obligation was to an insider;
(2) Whether the debtor retained possession or control of the property transferred after the transfer;
(3) Whether the transfer or obligation was disclosed or concealed;
(4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;
(5) Whether the transfer was of substantially all of the assets of the debtor;
(6) Whether the debtor absconded;
(7) Whether the debtor removed or concealed assets;
(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred;
(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.
See, also, comment 5 to Section 4 of the UFTA (stating that, except for a few exceptions, proof of the existence of any one or more of the "badges of fraud" may be relevant evidence as to actual intent but does not create a presumption of a fraudulent transfer).
 {¶ 50} Porter argues that five "badges of fraud" show that Saez perpetrated a fraudulent transfer: (1) the transfer was to an insider, namely, Heather Reed, Saez's girlfriend; (2) Saez, as the debtor, retained possession or control of the transferred property; (3) Saez's transfer was concealed; (4) Saez had been sued prior to the transfer; and (5) Saez removed or concealed assets.
 {¶ 51} Here, although there is evidence suggesting possible irregularities with Reed's mortgage loan applications and these mortgage loan applications were made during the litigation at issue, we do not find such irregularities necessarily constitute fraudulent transfers as Porter contends. Furthermore, we do not find Porter sustained her burden by demonstrating sufficient "badges of fraud" to support a summary judgment determination that the property transactions were fraudulent.
 {¶ 52} First, as discussed infra, Reed was not an "insider" as Porter contends. Second, the evidence is ambivalent regarding a claim that Saez retained possession of the Indianola property following the sale of the property to Reed. While Reed admits that following the sale of the Indianola property rent checks from tenants of the Indianola property were made payable to Saez, Reed also testified that Saez endorsed the rent checks to her, and Reed deposited the checks into her own account. (June 25, 2003, Reed Depo., at 30-31.) Moreover, even though Saez may pay a portion of the monthly mortgage payments for the Kioka property (id. at 57), we do not find such payments necessarily constitute an investment in the Kioka property as Porter contends. Rather, Reed and Saez had an informal arrangement whereby Saez financially contributed to the monthly mortgage payment as well as other household expenses. (Id. at 59-60.) Third, we do not find that possible irregularities in Reed's mortgage loan applications, without more, necessarily constitute concealment as Porter contends. Here, Saez's transfer of the Indianola property was disclosed; Saez did not abscond; and the value of the consideration received for the Indianola property appears to be reasonably equivalent to the value of the asset. Thus, under the facts and circumstances of this case, although alleged mortgage loan application irregularities may be present, based upon the evidence in the record, we do not find evidence that eliminates all genuine issues of material fact regarding Reed's actual intent to hinder, delay, or defraud.
 {¶ 53} Accordingly, we do not find Porter has sustained her burden in seeking summary judgment that the transfer of the Indianola property and the acquiring of the Kioka property constituted fraudulent transfers.
 {¶ 54} Moreover, because Porter's first assignment of error only raises the issue of whether the trial court properly denied Porter's motion for partial summary judgment pertaining to Porter's claim of a fraudulent transfer and not whether the trial court erred when it granted Reed's motion for partial summary judgment pertaining to Porter's claim of a fraudulent transfer, we do not consider here whether the trial court erred in granting Reed's motion for partial summary judgment.
 {¶ 55} Accordingly, Porter's first assignment of error is overruled.
 {¶ 56} Porter's second assignment of error asserts the trial court erred when it found Reed was not an "insider" for purposes of R.C. 1336.04(B). See R.C. 1336.04(B)(1) (consideration may be given to whether the transfer was to an insider when determining actual intent under R.C. 1336.04[A]).
 {¶ 57} R.C. 1336.01(G)(1) provides that for purposes of R.C. Chapter 1336, if a debtor is an individual, an "insider" includes any of the following:
(a) A relative of the debtor or of a general partner of the debtor;
(b) A partnership in which the debtor is a general partner;
(c) A general partner in a partnership described in division
(G)(1)(b) of this section;
(d) A corporation of which the debtor is a director, officer, or person in control.
 {¶ 58} According to R.C. 1336.01(K), as used within R.C. Chapter 1336, the term "relative" means "an individual related by consanguinity within the third degree as determined by the common law, a spouse, or an individual related to a spouse within the third degree as so determined, and includes an individual in an adoptive relationship within the third degree."
 {¶ 59} In this case, there is no evidence to support an inference that, at the time of the alleged fraudulent transfer, Saez was involved in a partnership or that Saez was a director, officer, or person in control of a corporation. Moreover, there is no evidence to support a finding that Saez and Reed were related by consanguinity or that Saez and Reed were married.
 {¶ 60} Nevertheless, relying upon Slaby v. Slaby (June 5, 1992), Ashtabula App. No. 91-A-1654, and K-Swiss, Inc. v. CowensSports Ctr., Inc. (Nov. 8, 1995), Greene App. No. 95-CA-48, Porter argues that even though Reed was not married to Saez at the time of the alleged fraudulent transfer, Reed should be considered a relative under R.C. 1336.01(G)(1)(a).
 {¶ 61} Porter's reliance upon Slaby and K-Swiss is not persuasive. In both Slaby and K-Swiss, the transfers were between spouses. Here, the alleged fraudulent transfer occurred between unmarried cohabiting adults, not spouses. Thus, Slaby
and K-Swiss are inapposite.
 {¶ 62} R.C. 1336.01(G)(1) provides a statutory nonexclusive list of whom or what may be considered an "insider" when a debtor is an individual. See, e.g., R.C. 1336.01(G) (stating that an "insider" "includes all of the following * * *" with no language that limits the definition of "insider" to the statutory list).
 {¶ 63} The cornerstone of statutory construction is legislative intention. State v. Jordan (2000),89 Ohio St.3d 488, 491, citing State ex rel. Francis v. Sours (1944),143 Ohio St. 120, 124. To determine legislative intent, "it is a cardinal rule of statutory construction that a court must first look to the language of the statute itself." Jordan, at 492, citing Provident Bank v. Wood (1973), 36 Ohio St.2d 101, 105. See, also, Lesnau v. Andate Enterprises, Inc. (2001),93 Ohio St.3d 467, 471, citing Christie v. GMS Mgt. Co., Inc. (2000),88 Ohio St.3d 376, 377 (observing that when construing a statute, a court should look to the language of the statute and its purpose).
 {¶ 64} Here, the express language of R.C. 1336.01(G)(1) does not provide that an unmarried cohabiting partner of an individual debtor should be considered an "insider" for purposes of R.C.1336.01(G)(1).
 {¶ 65} Nonetheless, we realize that the General Assembly's failure to provide that an unmarried cohabiting partner of an individual debtor should be considered an "insider" for purposes of R.C. 1336.01(G)(1) may be a poor beacon for us to follow to determine legislative intent.
 {¶ 66} As observed in In re Landrum (2001), 267 B.R. 577,581:
The Supreme Court has long held that silence is rarely, if ever, an effective barometer of legislative intent. Zuber v.Allen, 396 U.S. 168, 185, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969) ("Legislative silence is a poor beacon to follow in discerning the proper statutory route."); Girourard v. United States,328 U.S. 61, 69, 66 S.Ct. 826, 90 L.Ed. 1084 (1946) (" It is at best treacherous to find in Congressional silence alone the adoption of a controlling rule of law.")
 {¶ 67} Nevertheless, as appositely observed in In reLandrum:
* * * On the other hand, "[t]he language of the statutes that Congress enacts provides `the most reliable evidence of its intent.'" Holloway v. United States, 526 U.S. 1, 6,119 S.Ct. 966, 143 L.Ed.2d 1 (1999) (quoting United Statesv. Turkette, 452 U.S. 576, 593, 101 S.Ct. 2524,69 L.Ed. 246 (1981)). See United States v. Locke, 471 U.S. 84,96-96, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985) ("`Going behind the plain language of a statute in search of a possibly contrary congressional intent is "a step to be taken cautiously" even under the best of circumstances.'" American Tobacco Co. v.Patterson, 456 U.S. 63, 75, 102 S.Ct. 1534, 1540,71 L.Ed.2d 748 (1982) (quoting Piper v. Chris-Craft Industries,Inc., 430 U.S. 1, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124
(1977)). When even after taking this step nothing in the legislative history remotely suggests a congressional intent contrary to Congress' chosen words . . . any further steps take the courts out of the realm of interpretation and place them in the domain of legislation."). * * *
Id. at 581-582.
 {¶ 68} Here, we find the language of the statute as enacted by the General Assembly in 1990 provides reliable evidence of the General Assembly's intent not to include an unmarried cohabiting partner of an individual debtor as an "insider" for purposes of R.C. 1336.01(G)(1). See Sub.H.B. No. 506, 143 Ohio Laws, Part III, 5403.
 {¶ 69} Furthermore, we do not find R.C. 1336.01(G)(1)(a) is ambiguous.
 {¶ 70} "`If the meaning of the statute is unambiguous and definite, it must be applied as written and no further interpretation is necessary.'" Jordan, at 492, quoting Stateex rel. Savarese v. Buckeye Local School Dist. Bd. of Edn.
(1996), 74 Ohio St.3d 543, 545. Moreover, to determine the intent of the General Assembly, "`"[i]t is the duty of [a court] to give effect to the words used [in a statute], not to delete words used or to insert words not used."'"Jordan, at 492, quoting Bernardini v. Conneaut Area City School Dist. Bd. ofEdn. (1979), 58 Ohio St.2d 1, 4 (quoting Columbus-SuburbanCoach Lines v. Pub. Util. Comm. [1969], 20 Ohio St.2d 125, 127. [Emphasis sic.])
 {¶ 71} Therefore, absent any ambiguity, there is no need to interpret R.C. 1336.01(G)(1)(a).
 {¶ 72} Accordingly, Porter's second assignment of error is not persuasive and is overruled.
 {¶ 73} Porter's third assignment of error asserts the trial court erred in granting summary judgment in favor of Reed pertaining to Porter's conspiracy claim because genuine ises of material fact exist that preclude summary judgment.
 {¶ 74} "The tort of civil conspiracy is `"a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages."'" Williams v. Aetna Finance Co. (1998),83 Ohio St.3d 464, 475, certiorari denied (1999), 526 U.S. 1051,119 S.Ct. 1357, quoting Kenty v. Transamerica Premium Ins. Co.
(1995), 72 Ohio St.3d 415, 419, quoting LeFort v. Century21-Maitland Realty Co. (1987), 32 Ohio St.3d 121, 126; Gosdenv. Louis (1996), 116 Ohio App.3d 195, 219, appeal not allowed (1997), 78 Ohio St.3d 1456; Minarik v. Nagy (1963),8 Ohio App.2d 194, 196, appeal dismissed (1964), 176 Ohio St. 326. "An underlying unlawful act is required before a civil conspiracy claim can succeed." Williams, supra, at 475, citing Gosden,
supra, at 219; Minarik, supra, at 195. See, also, Gosden, at 221 ("[t]he `gist' of a conspiracy action is not the conspiracy itself, and the conspiracy becomes important only after the wrong is committed").
 {¶ 75} "The malice involved in the tort is `that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another.'"Williams, at 475, quoting Pickle v. Swinehart (1960),170 Ohio St. 441, 443; Gosden, supra, at 219. See, also, Gosden,
at 219-220 (observing that "`malice,' then, would be inferred from or imputed to a common design by two or more persons to cause harm to another by means of an underlying tort, and need not be proven separately or expressly").
 {¶ 76} Moreover, "[t]he element of `malicious combination to injure' does not require a showing of an express agreement between defendants, but only a common understanding or design, even if tacit, to commit an unlawful act." Gosden, at 219. See, also, id., quoting Pumphrey v. Quillen (1955),102 Ohio App. 173, 178, affirmed (1956), 165 Ohio St. 343 (Taft, J., dissenting), citing Houston v. Avery (1935), 19 Ohio Law Abs. 142, 147 ("`it is sufficient that the parties in any manner come to a mutual understanding that they will accomplish the unlawful design'").
 {¶ 77} "The element of `resulting in actual damages' means that, if a plaintiff suffers no actual damages from the underlying unlawful act, there can be no successful civil conspiracy action." Gosden, at 220. See, also, Pacific GreatLakes Corp. v. Bessemer Lake Erie RR. (1998),130 Ohio App.3d 477, 496, appeal not allowed (1999),85 Ohio St.3d 1427, citing Fed. Prescription Serv.,Inc. v. Am. Pharmaceutical Assn. (C.A.D.C. 1981),663 F.2d 253, 268-269, certiorari denied455 U.S. 928, 102 S.Ct. 1293
("[i]t is well established that the law does not look to a conspiracy in a vacuum to determine injury, but instead looks to overt acts of the conspiracy to determine whether it caused any injury").
 {¶ 78} Here, because the trial court granted summary judgment in favor of Reed pertaining to Porter's claim of a fraudulent transfer between Saez and Reed, and in this appeal Porter has not contested this determination by the trial court, see paragraph 54, supra, we therefore conclude no fraudulent transfer occurred between Saez and Reed. Because an underlying act is required before a civil conspiracy claim can succeed, Williams, at 475, and having concluded no fraudulent transfer occurred between Saez and Reed, we find Porter's claim of civil conspiracy must fail. See, e.g., Northeast Ohio College of Massotherapy v. Burek
(2001), 144 Ohio App.3d 196, 211 (concluding that because tortious interference with contract claim failed, as a matter of law, conspiracy claim also failed).
 {¶ 79} Therefore, Porter's third assignment of error is not persuasive and is overruled.
 {¶ 80} For the foregoing reasons, all three of appellant's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
 Bryant and Watson, JJ., concur.
[1] During the course of litigation, Edward Elford was also referred to as Edward Alford in different filings.
[2] See, also, Columbus v. Saez, Franklin Cty. M.C. No. 99-76659 (imposing a fine of $350 plus costs for failing to comply with Columbus Ordinance No. 4111.01). (Exhibit 4 attached to March 17, 2003, Depo. of Aaron M. Saez.)
[3] Prior to this case, Porter sued Saez in Franklin County Municipal Court. See Porter v. Saez, Franklin Cty. M.C. No. 00CVF37165. On July 3, 2001, pursuant to Civ.R. 41, plaintiff dismissed without prejudice the action.
[4] In this appeal, defendant-appellee, Heather Reed, did not timely file a merit brief and her motion for an extension of time in which to file her merit brief was denied. (Journal Entry filed December 31, 2003.)